# 24-2386

*To Be Argued By*:
MÓNICA P. FOLCH

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 24-2386

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

—v.—

EZ LYNK, SEZC, PRESTIGE WORLDWIDE SEZC,
THOMAS WOOD, BRADLEY GINTZ,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLANT

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York,*
*Attorney for Plaintiff-Appellant.*
86 Chambers Street, 3rd Floor
New York, New York 10007
(212) 637-6559

MÓNICA P. FOLCH,
JENNIFER JUDE,
ZACHARY BANNON,
BENJAMIN H. TORRANCE,
  *Assistant United States Attorneys,*
    *Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .   1

Jurisdictional Statement . . . . . . . . . . . . . . . . . . . . .   3

Issue Presented for Review . . . . . . . . . . . . . . . . . . .   3

Statement of the Case . . . . . . . . . . . . . . . . . . . . . .   4

    A.   Procedural History . . . . . . . . . . . . . . . . . . . .   4

    B.   The Clean Air Act . . . . . . . . . . . . . . . . . . . . .   5

    C.   The Communications Decency Act . . . . . . .   6

    D.   The Government's Complaint . . . . . . . . . . .   8

        1.   The EZ Lynk System . . . . . . . . . . . . . . .   8

            a.   Gintz's and Wood's History with
               Defeat Devices . . . . . . . . . . . . . . . .   8

            b.   EZ Lynk Manufactures and
               Sells the EZ Lynk System
               Defeat Device . . . . . . . . . . . . . . . .   10

            c.   EZ Lynk Participates in the
               Creation of Delete Tunes and
               Encourages Their Use on the
               EZ Lynk System . . . . . . . . . . . . . .   11

            d.   The EZ Lynk System Is
               Widely Used to Defeat
               Emissions Controls . . . . . . . . . . . .   15

    E.   The District Court's Decision
       and Judgment . . . . . . . . . . . . . . . . . . . . . . .   15

ii

PAGE

Summary of the Argument . . . . . . . . . . . . . . . . . . .  19

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

Standard of Review . . . . . . . . . . . . . . . . . . . . . . .  21

EZ Lynk Is Not Immune Under the
Communications Decency Act for
Manufacturing and Selling Emissions-
Control Defeating Devices in
Violation of the Clean Air Act. . . . . . . . . . . . . . .  22

    A.   Requirements of the Communications
        Decency Act's Affirmative Defense . . . . . .  23

    B.   EZ Lynk Cannot Establish the
        Elements of a Section 230 Defense . . . . . .  24

        1.   The Complaint Does Not Seek to
            Hold EZ Lynk Liable for Publishing
            "Information" . . . . . . . . . . . . . . . . . . .  25

        2.   The Complaint Does Not Treat
            EZ Lynk as a Publisher, but as a
            Manufacturer and Seller of a System
            That Installs Unlawful Emissions-
            Control Defeating Software. . . . . . . . .  28

        3.   EZ Lynk's Participation in the
            Development and Use of Delete
             Tunes Means Section 230 Immunity
            Does Not Apply . . . . . . . . . . . . . . . . . .  35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

iii

## TABLE OF AUTHORITIES

*Cases*:

*Arista Records LLC v. Doe 3*,
    604 F.3d 110 (2d Cir. 2010) . . . . . . . . . . . . . . . . 41

*Barnes v. Yahoo!, Inc.*,
    570 F.3d 1096 (9th Cir. 2009) . . . . . . . . . . . . 30, 32

*Burlington Industries, Inc. v. Ellerth*,
    524 U.S. 742 (1998) . . . . . . . . . . . . . . . . . . . . . . . . 40

*CFTC v. Vartuli*,
    228 F.3d 94 (2d Cir. 2000) . . . . . . . . . . . . . . 25, 26

*Dixon v. von Blanckensee*,
    994 F.3d 95 (2d Cir. 2021) . . . . . . . . . . . . . . . . . . 9

*Doe v. Internet Brands, Inc.*,
    824 F.3d 846 (9th Cir. 2016) . . . . . . . . . . . . . . . 32

*Erie Insurance Co. v. Amazon.com, Inc.*,
    925 F.3d 135 (4th Cir. 2019) . . . . . . . . . . . . 30, 32

*Fair Housing Council of San Fernando Valley v.*
    *Roommates.com, LLC*,
    521 F.3d 1157 (9th Cir. 2008) . . . . . . . . . . . *passim*

*Force v. Facebook, Inc.*,
    934 F.3d 53 (2d Cir. 2019) . . . . . . . . . . . 23, 24, 29

*FTC v. Accusearch Inc.*,
    570 F.3d 1187 (10th Cir. 2009) . . . . 35, 36, 40, 41

*FTC v. LeadClick Media, LLC*,
    838 F.3d 158 (2d Cir. 2016) . . . . . . . . . . . . . *passim*

iv

PAGE

*G.G. v. Salesforce.com, Inc.*,
 76 F.4th 544 (7th Cir. 2023). . . . . . . . . . . . . . . . 32

*Henderson v. Source for Public Data, L.P.*,
 53 F.4th 110 (4th Cir. 2022). . . . . . . . . . . . . . . . 33

*HomeAway.com, Inc. v. City of Santa Monica*,
 918 F.3d 676 (9th Cir. 2019) . . . . . . . . . . . . 32, 33

*INS v. St. Cyr*,
 533 U.S. 289 (2001). . . . . . . . . . . . . . . . . . . . . . 30

*Jones v. Dirty World Entertainment*
 *Recordings LLC*,
 755 F.3d 398 (6th Cir. 2014) . . . . . . . . . . . . . . . 29

*Kaplan v. Lebanese Canadian Bank, SAL*,
 999 F.3d 842 (2d Cir. 2021) . . . . . . . . . . . . . . . 21

*Kelly-Brown v. Winfrey*,
 717 F.3d 295 (2d Cir. 2013) . . . . . . . . . . . . . . . 22

*Klayman v. Zuckerberg*,
 753 F.3d 1354 (D.C. Cir. 2014). . . . . . . . . . . . . . 29

*Michael Grecco Productions, Inc. v.*
 *RADesign, Inc.*,
 112 F.4th 144 (2d Cir. 2024) . . . . . . . . . . . . 22, 36

*In re: Nine West LBO Securities Litig.*,
 87 F.4th 130 (2d Cir. 2023) . . . . . . . . . . . . . 21, 36

*Perry v. Merit Systems Protection Board*,
 582 U.S. 420 (2017). . . . . . . . . . . . . . . . . . . 21, 36

*Ricci v. Teamsters Union Local 456*,
 781 F.3d 25 (2d Cir. 2015) . . . . . . . . . . . . . . . . 24

v

PAGE

*Rich v. Fox News Network, LLC,*
  939 F.3d 112 (2d Cir. 2019) . . . . . . . . . . . . . . . . . 41

*Slattery v. Hochul,*
  61 F.4th 278 (2d Cir. 2023) . . . . . . . . . . . . . . . . 21

*Stratton Oakmont, Inc. v. Prodigy Services Co.,*
  No. 31063/94, 1995 WL 323710
  (N.Y. Sup. Ct. 1995) . . . . . . . . . . . . . . . . . . . . . 6, 7

*Universal City Studios, Inc. v. Corley,*
  273 F.3d 429 (2d Cir. 2001) . . . . . . .  25, 26, 27, 28

*Zeran v. America Online, Inc.,*
  129 F.3d 327 (4th Cir. 1997) . . . . . . . . . . . . . . . 29

*Statutes*:

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. § 7401 . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

42 U.S.C. § 7521 . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

42 U.S.C. § 7522 . . . . . . . . . . . . . . . . . . . . . . . *passim*

42 U.S.C. § 7525 . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

42 U.S.C. § 7542 . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

47 U.S.C. § 230 . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Pub. L. No. 104-104, 110 Stat. 56 . . . . . . . . . . . . . . 6

vi

PAGE

*Regulations*:

40 C.F.R. Part 86 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Legislative Materials*:

S. Rep. 101-228 (1989) . . . . . . . . . . . . . . . . . . . . . . . . 28

H.R. Conf. Rep. 104-458 (1996) . . . . . . . . . . . . . . . . . 6

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 24-2386

————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

—v.—

EZ LYNK, SEZC, PRESTIGE WORLDWIDE SEZC,
THOMAS WOOD, BRADLEY GINTZ,

*Defendants-Appellees.*

————————

## BRIEF FOR PLAINTIFF-APPELLANT

————————

## Preliminary Statement

The EZ Lynk System, manufactured and sold by the defendants in this action, disables vehicles' emissions controls. The system consists of a physical device to plug into vehicles to install software that renders vehicles' computerized emissions controls inoperative, a cloud-based platform that hosts emissions-control defeating software, and a smartphone app that connects the two. The government sued the makers of the EZ Lynk System, and the district court correctly determined that the government stated a claim that the EZ Lynk System is a "defeat device"—namely, a device

2

that defeats emissions controls—whose sale and manufacture are prohibited by the Clean Air Act.

But the district court then dismissed the government's case. In the district court's view, the EZ Lynk System is an "interactive computer service" that merely "publishes" emissions-control defeating software as third-party content—and therefore, under section 230 of the Communications Decency Act, its makers are immunized from liability, even though the United States adequately alleged that what they make and sell is an illegal defeat device.

That was error. As the government alleged in this action, the makers of the EZ Lynk System are not merely passive hosts of third-party content on a website. They have manufactured and sold tens of thousands of EZ Lynk Systems, whose principal component is a patented hardware device designed with particular technical functionalities that enable it to access and reprogram vehicles' emissions controls. They maintain an online forum where drivers regularly post about "delet[ing]" their vehicles' emissions controls using the "ez lynk install" which "work[s] flawlessly" to deliver "huge improvements"—actively encouraged and assisted by EZ Lynk personnel. While one part of the EZ Lynk System is a cloud-computing platform where customers can download emissions-control defeating software created by third parties, the installation of that software depends on the whole EZ Lynk System, including the physical device that must be plugged into a vehicle. Moreover, the EZ Lynk System's makers work with companies to develop the

3

emissions-control defeating software that they make available on their cloud-computing platform.

The government's action thus seeks to hold EZ Lynk liable for its own conduct violating the Clean Air Act—the manufacture and sale of a defeat device—and not the conduct of their customers or collaborators. The Communications Decency Act does not create immunity for parties whose own misconduct makes them liable under other laws. Nor does it apply to the dissemination of computer code that conveys not information to humans, but instructions to an electronic system. The district court was wrong to dismiss this action at the pleading stage, particularly given that the Communications Decency Act is an affirmative defense that EZ Lynk bears the burden of establishing. This Court should reverse the judgment.

## Jurisdictional Statement

The district court had jurisdiction over this action under 28 U.S.C. §§ 1331 (as it arises under the laws of the United States), 1345 (for actions brought by the United States), and 1355 (for actions to collect fines or penalties imposed by federal law). The district court entered judgment on July 11, 2024 (Joint Appendix ("JA") 131), and the government timely filed a notice of appeal on September 6, 2024 (JA 132). Accordingly, this Court has jurisdiction under 28 U.S.C. § 1291.

## Issue Presented for Review

Whether the district court erred in determining that, although the government adequately alleged that defendants violated the Clean Air Act by

4

manufacturing and selling the EZ Lynk System, they are immunized from Clean Air Act liability under section 230 of the Communications Decency Act, under which a "provider . . . of an interactive computer service" may not "be treated as the publisher or speaker" of information provided by a third party.

### Statement of the Case

#### A. Procedural History

The government commenced this action on March 8, 2021, against EZ Lynk, SEZC; Prestige Worldwide, SEZC; Bradley Gintz; and Thomas Wood (collectively, "EZ Lynk"), alleging violations of two provisions of the Clean Air Act: 42 U.S.C. § 7522(a)(3)(B), which prohibits the manufacture and sale of defeat devices; and 42 U.S.C. § 7542(a), which requires certain parties to provide information to the Environmental Protection Agency ("EPA") upon request. (JA 13-44). On September 23, 2021, EZ Lynk moved to dismiss on several grounds, including that section 230 of the Communications Decency Act ("CDA") barred liability on the defeat-device claim. (JA 7). The government cross-moved for summary judgment on the information-request claim. (JA 8). On March 28, 2024, the district court issued an opinion and order granting in part and denying in part EZ Lynk's motion to dismiss, and denying the government's motion for summary judgment. (JA 104-29). On July 5, 2024, the parties entered a stipulation of voluntary dismissal of the information-request claim. (JA 130). Final judgment was entered on July 11, 2024. (JA 131). The government appealed the judgment on September 6, 2024. (JA 132).

5

## B. The Clean Air Act

Congress enacted the Clean Air Act "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). As one mechanism to achieve that end, the Act regulates motor vehicle emissions that have been linked to a range of serious health problems, from chest pain to asthma to heart disease. (JA 17-18 ¶¶ 17-20). In order to control emissions of pollutants and comply with the Clean Air Act, vehicle manufacturers install a variety of hardware and software "elements of design" in vehicles ("Emission-Related Elements of Design"). (JA 19-20 ¶¶ 23-26); 42 U.S.C. §§ 7521, 7522, 7525; 40 C.F.R. Part 86. Vehicles are also equipped with Electronic Control Units ("ECUs") and on-board diagnostics ("OBD") systems that monitor Emission-Related Elements of Design. 40 C.F.R. §§ 86.007-17, 86.010-18, 86.1803-01, 86.1806-05. Testing has shown that eliminating a vehicle's emissions controls substantially increases pollutant emissions. (JA 18 ¶ 21). In fact, eliminating vehicle emissions controls can increase a vehicle's carbon monoxide output 130-fold, nitrogen oxide output 350-fold, and non-methane hydrocarbon output 1100-fold. (JA 18 ¶ 21).

To prevent the release of these toxic pollutants, section 203 of the Clean Air Act contains a number of prohibitions regarding Emission-Related Elements of Design. Manufacturers are forbidden from selling new vehicles without an EPA certificate of conformity with regulatory requirements. 42 U.S.C. § 7522(a)(1). The Emission-Related Elements of Design may not be

6

removed or made inoperable, either before or after the sale of a vehicle. *Id*. § 7522(a)(3)(A). And of particular relevance here, the Clean Air Act prohibits the apparatuses commonly known as "defeat devices": no person may "manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative" an Emission-Related Element of Design, "where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use." *Id*. § 7522(a)(3)(B). The prohibition on the sale of defeat devices is enforceable through civil penalties and injunctive relief. *Id*. §§ 7523, 7524.

### C.   The Communications Decency Act

Section 230 of the Communications Decency Act was enacted in 1996, and is titled "Protection for private blocking and screening of offensive material." Pub. L. No. 104-104, § 509, 110 Stat. 56, *codified at* 47 U.S.C. § 230(c)(1). A "specific purpose[]" of this provision was to respond to a state trial-court decision, *Stratton Oakmont, Inc. v. Prodigy Services Co.*, No. 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. 1995). H.R. Conf. Rep. 104-458, at 194 (1996). *Stratton Oakmont* involved a defamation suit against an online service provider based on messages a third party had posted on an online bulletin board. 1995 WL 323710, at *1. Under common-law defamation principles, those who "publish" a defamatory statement—that is, communicate it to someone other than the person defamed—can be held liable without proof that they knew the

7

statement was defamatory, resulting in a form of strict liability. The *Stratton Oakmont* court used the term "publisher" in this way, understanding it to include entities that are presumed to have editorial control over what they print. 1995 WL 323710, at *3. It concluded that the online service provider, having screened postings to the bulletin board and removed some of them, was a "publisher" of and thus liable for any defamatory speech that remained. *Id.* at *4-5.

In the legislative findings included in section 230, Congress recognized that the Internet "represent[s] an extraordinary advance in the availability of educational and informational resources" and "offer[s] a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." 47 U.S.C. § 230(a)(1), (3). Congress declared it the "policy of the United States" to "promote the continued development of the Internet and other interactive computer services," *id.* § 230(b)(1), and to "remove disincentives for the development and utilization of blocking and filtering technologies" that could better restrict access to objectionable material online, *id.* § 230(b)(4). To that end, section 230(c) establishes two complementary protections. Section 230(c)(1) directs that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." And section 230(c)(2) states that "[n]o provider or user of an interactive computer service shall be held liable on account of . . . any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene,

8

lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." The statute expressly preempts any "cause of action" or "liability" "under any State or local law that is inconsistent with" those provisions. 47 U.S.C. § 230(e)(3).

### D.  The Government's Complaint

#### 1.  The EZ Lynk System

As alleged in the government's complaint: EZ Lynk manufactures and sells the EZ Lynk System, which is "designed to remove, bypass, defeat, or render inoperative emissions controls installed in vehicles," in violation of the Clean Air Act. (JA 23 ¶ 40). Gintz and Wood are co-founders, co-owners, and directors of EZ Lynk, SEZC. (JA 16-17 ¶¶ 12-13). Together, they "control[], direct[], and manage[] the marketing and sale of the EZ Lynk System as well as the technical support for the EZ Lynk System." (JA 16-17 ¶¶ 12-13).

#### a.    Gintz's and Wood's History with Defeat Devices

Long before forming EZ Lynk, Gintz and Wood were in the business of manufacturing and selling defeat devices. (JA 24 ¶¶ 42-44). Gintz himself has installed defeat devices on his customers' trucks. (JA 24 ¶ 43). Between 2010 and 2014, Wood provided engineering services to a company called H&S Performance, LLC. (JA 24 ¶ 44). Specifically, Wood supported the development of H&S's aftermarket tuner—a device EPA found to violate the Clean Air Act, which led to H&S's payment of a $1,000,000 fine to EPA in 2015. (JA 24 ¶ 44).

9

In 2016, Gintz and Wood designed the EZ Lynk System to defeat vehicles' emissions controls. (JA 24-25 ¶¶ 45-47). That year, Gintz and Wood patented the first generation EZ Lynk System. (JA 24-25 ¶ 45-46). The patent application is titled "System and method for real time wireless ECU monitoring and reprogramming," lists Gintz and Wood as inventors, and includes a detailed description of the system's functionality. (JA 24-25 ¶ 45 (citing U.S. Patent No. 10,037,633)). In particular, the patent application describes the EZ Lynk System as consisting of three components—a "local device" that connects to the automotive controller, a "system server," and a "client device" that wirelessly connects to the local device and the system server to obtain engine data and then send software to the automotive controller. U.S. Patent No. 10,037,633, at 1, *available at* https://perma.cc/P9RT-6DKG.[1] The patent application provides that the device is capable of reprogramming "settings used to tune the engine for efficiency or performance, including settings for ignition timing advance, spark timing, fuel injection, electronic throttle control, poppet valve timing, [and] boost control." (JA 25 ¶ 46). Changes to any of these settings can affect emissions controls. (JA 25 ¶ 46). The EZ Lynk System patent application separately sets forth two drawings that demonstrate that the device is capable of modifying the pilot-injection and smoke-

──────────

[1]    This patent was referred to in the government's complaint (JA 24-25 ¶ 45) and may therefore be considered on this appeal. *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021).

10

limitation settings, both of which can also affect emissions controls. (JA 25 ¶ 46).

In 2016, Gintz and Wood formed EZ Lynk, SEZC, as a Cayman Islands "special economic zone company" to manufacture and sell the product, and they assigned their patent to that company. (JA 16-17 ¶ 10, JA 24-25 ¶ 45).

### b.  EZ Lynk Manufactures and Sells the EZ Lynk System Defeat Device

As noted above, the EZ Lynk System consists of three components. (JA 13-14 ¶ 1). The first component is the EZ Lynk Auto Agent, a physical apparatus that plugs into a vehicle's OBD port. (JA 13-14 ¶ 1, JA 25 ¶ 47). Once plugged in, the Auto Agent is able "to access, override, or reprogram the vehicle's computer system, including aspects of the ECU and OBD system, as well as various other Emission-Related Elements of Design." (JA 25 ¶ 47). The EZ Lynk Auto Agent is compatible with over 180 makes and models of vehicles. (JA 24 ¶ 41, JA 25 ¶ 47). The second component is the EZ Lynk Cloud, a cloud-computing platform that stores software that may be installed using the Auto Agent. (JA 13-14 ¶ 1, JA 25-26 ¶ 48, JA 26-27 ¶¶ 51-54). The third component is the EZ Lynk Auto Agent App, a smartphone app that connects the Auto Agent to the EZ Lynk Cloud. EZ Lynk's own description of the Auto Agent App makes clear that the EZ Lynk System allows users to "reprogram your vehicle easily from your Smartphone." (JA 13-14 ¶ 1, JA 25-26 ¶ 48).

11

The EZ Lynk Cloud stores calibration software known as "tunes"; many of these are "delete tunes," which are designed to defeat Emission-Related Elements of Design. (JA 26 ¶ 49, JA 27-28 ¶¶ 53-54). The delete tunes stored on the EZ Lynk Cloud are created specifically for use with the EZ Lynk Auto Agent by third party "technicians." (JA 26 ¶¶ 49-50). Drivers who purchase the EZ Lynk System log on to the EZ Lynk Cloud to acquire delete tunes, use the Auto Agent App to transfer delete tunes, and plug in the Auto Agent to install delete tunes on vehicles' computer systems. (JA 25-27 ¶¶ 47-54). As advertised, the EZ Lynk System is capable of "'accessing deeper into the vehicle's computers' to 'enhance [the vehicle's] overall performance and fuel economy,'" which are typical goals of drivers installing defeat devices. (JA 22 ¶ 33, JA 29 ¶ 55).

Since 2016, EZ Lynk has manufactured and sold at least tens of thousands of EZ Lynk Systems, a large proportion of which were sold to drivers in the United States. (JA 29 ¶ 56).

### c. EZ Lynk Participates in the Creation of Delete Tunes and Encourages Their Use on the EZ Lynk System

In addition to manufacturing and selling the EZ Lynk System, EZ Lynk helps create delete tunes and promotes their use with the EZ Lynk System.

First, EZ Lynk collaborates with delete-tune creators to ensure that they produce delete tunes specifically for use with the EZ Lynk System. (JA 29 ¶ 57). In particular, EZ Lynk previewed the EZ Lynk System

12

for delete-tune creators while the EZ Lynk System was in development "to ensure that delete tunes capable of effectively disabling emissions controls are readily available to drivers using the EZ Lynk System." (JA 29 ¶ 57). For instance, one technician that created tunes specifically for use with the EZ Lynk System stated that it was "fortunate" to be able "to work with the guys at EZ Lynk during development of [its] state of the art software and ha[s] been amazed at what the EZ Lynk platform is capable of." (JA 29 ¶ 57).

As another example, EZ Lynk previewed the EZ Lynk System's technology for Power Performance Enterprises, Inc. ("PPEI"), another technician that was involved in testing the EZ Lynk System in its early stages and created delete tunes for customers to install using the system. (JA 29 ¶ 58, JA 27-28 ¶¶ 53-54 (showing a selection of PPEI "No Em[issions]" delete tunes available on the EZ Lynk Cloud), JA 32-33 ¶ 67 (driver "installed an ez lynk from ppei and egr[2] delete")). Indeed, PPEI's delete tunes have regularly been sold "bundled with" the EZ Lynk System. (JA 30 ¶¶ 61-62 (EZ Lynk System bundled with PPEI delete tunes offered for sale)). EZ Lynk provides delete-tune creators with "a free, cloud-based software program called the EZ Lynk ECU Profile Editor" that enables them to create delete tunes for use with the EZ Lynk System. (JA 30 ¶ 59).

--------

2   Presumably the "exhaust gas recirculation" system, an Emission-Related Element of Design. (JA 19 ¶ 25).

13

EZ Lynk also provides technical assistance to drivers who purchase the EZ Lynk System, helping them install delete tunes to ensure that they can successfully defeat their vehicles' emissions controls. (JA 32-33 ¶ 67). EZ Lynk has maintained a Facebook group called the EZ Lynk Forum, administered by EZ Lynk and the delete-tune creator PPEI, on which the EZ Lynk Technical Support Team provides technical assistance when drivers who purchase the EZ Lynk System experience problems deleting emissions controls. (JA 31 ¶ 64, JA 32-33 ¶ 67). For example:

- One driver posted to the EZ Lynk Forum, "Installed ez Lynk on my 14 ram 3500 fully deleted the other day [and] as soon as it loaded" certain dashboard malfunction indicator lights—which are Emission-Related Elements of Design (JA 20-21 ¶ 29, JA 26 ¶ 49)—illuminated. The driver asked if anyone else had experienced the same problem. EZ Lynk's Technical Support Representative provided several long and detailed responses about how to fix the problem, and the driver wrote "[p]roblems fixed with the help of EZ Lynk's Technical Support Representative and hpp tunes."

- A driver posted on Facebook in the EZ Lynk Forum, "just installed an ez lynk from ppei and egr delete . . . [but] I have no ecu profiles from ppei? What's going on here?" In response, EZ Lynk's Technical Support Representative and PPEI's owner posted questions and advice to troubleshoot the issue with the delete process. Ultimately, PPEI's owner fixed the driver's issue

14

remotely through the EZ Lynk Cloud, and the driver responded by posting, "Thank you so much for the awesome service! I love the way the truck is now being deleted!"

- A driver posted, "My ezlynk has worked great since the day I had it installed! Even going from stock to deleted I had ZERO issues! I just wanted everyone to know this is a great system and my pickup runs great, zero smoke and my mpg's went up about 6mpg. SHIT!! I just can't believe how well it connects and never gives me issues! Even when I had a small situation I CALLED THEM and BAM!! Problem solved! Good day." In response, an EZ Lynk representative "loved" this post.

(JA 32-33 ¶ 67). In addition to providing technical support via this Facebook group to help users install delete tunes, EZ Lynk also operates a tech-support phone line, email address, and website. (JA 33 ¶¶ 69-70).

Indeed, EZ Lynk actively encourages users to install delete tunes with the EZ Lynk System. On the EZ Lynk Forum, EZ Lynk representatives openly support the installation of delete tunes, "liking" and "loving" posts that read: "Finally made the jump and deleted my 14 Ram 2500"; "Truck has shown huge improvement with the deletes and new tunes"; and "ez Lynk/delete set up will arrive on my door step next week." (JA 32 ¶ 66).

15

### d.    The EZ Lynk System Is Widely Used to Defeat Emissions Controls

The result of EZ Lynk's design, manufacture, and sale of a device built to defeat emissions controls is that the EZ Lynk System has been put to widespread use for that purpose. Retailers regularly offer the EZ Lynk System for sale pre-packaged with delete tunes. (JA 30 ¶ 61, JA 31 ¶ 63). Hundreds of posts on online message boards, Youtube.com, and social media show the prevalence of the EZ Lynk System: a driver with the username 2fast4thelaw posted a guide on "How to Delete and Tune" a Nissan truck with the EZ Lynk System; a thread on reddit.com included several users recommending the EZ Lynk System to delete emissions controls from a vehicle; and a driver who was "a little worried about engine longevity and the government" posted on powerstroke.org that he had deleted his vehicle's emissions controls with "a PPEI EZ Lynk tuner." (JA 34-35 ¶¶ 71-72). Moreover, the harmful effects of the EZ Lynk System outlive the original user. In a three-month period in 2017, the government found more than fifty advertisements for vehicles for sale with their emissions controls deleted by the owner using the EZ Lynk System across twenty states. (JA 35-36 ¶ 74, JA 36 ¶¶ 75-76 (discussing more recent advertisements for vehicles that had their emissions controls deleted with the EZ Lynk System)).

### E.    The District Court's Decision and Judgment

On March 28, 2024, the district court granted in part and denied in part EZ Lynk's motion to dismiss and denied in full the government's motion for

16

summary judgment. The district court dismissed the government's claims under section 203 of the Clean Air Act based on the conclusion that the CDA immunizes EZ Lynk from liability. (JA 118-26).

First, the district court concluded that the government's complaint adequately alleges that the EZ Lynk System is a defeat device under section 203 of the Clean Air Act. (JA 116-18). The district court determined that the government sufficiently pleaded that the EZ Lynk System is a "part or component" intended for use with a motor vehicle by alleging the EZ Lynk System consists of the Auto Agent device, the EZ Lynk Cloud, and the Auto Agent App; the Auto Agent plugs into a vehicle's on-board diagnostics port; and once the Auto Agent is connected to the EZ Lynk Cloud through the Auto Agent App, drivers are able to send and receive data and software relating to their vehicles' computer systems. (JA 116-17). The district court rejected EZ Lynk's argument that the EZ Lynk System is a "scan tool" rather than a "part or component," noting that "part" is a "capacious term" and "the text of the statute and the allegations in the Complaint" lead to the conclusion that "the EZ Lynk System, whose hardware has to be plugged into the car, is a car part." (JA 117).

In addition, the district court ruled that the government had sufficiently alleged that "'a principal effect'" of the EZ Lynk System is to "'defeat'" emissions controls and that EZ Lynk "'knows or should know'" that it is "'put to such use.'" (JA 117 (quoting 42 U.S.C. § 7522(a)(3)(B))). The complaint alleges that EZ Lynk has enabled many thousands of drivers across the

17

United States to use the EZ Lynk System to "delete" emissions controls from Ford, GMC, and Chrysler trucks, among other vehicles; many of the "tunes" available for use with the EZ Lynk System are capable of defeating emissions controls; and hundreds of posts on the EZ Lynk Forum and numerous posts on numerous other sites discuss using the EZ Lynk System to defeat emissions controls. (JA 117).[3]

Despite concluding that the EZ Lynk System was a defeat device, the district court ruled that "it is clear on the face of the complaint that Section 230 [of the Communications Decency Act] immunizes the EZ Lynk Defendants," requiring dismissal of the government's section 203 claims. (JA 119).[4]

The district court first ruled that the EZ Lynk System is an "interactive computer service" due to the presence of the EZ Lynk Cloud, concluding that because the EZ Lynk Cloud "is a platform on which

---

[3] The district court concluded that the complaint's allegations are insufficient to establish a section 203 claim as to defendant Prestige, which sells only the Auto Agent device rather than the complete EZ Lynk System. (JA 117-18). The government is not appealing that aspect of the district court's judgment.

[4] Because the district court concluded this holding also immunizes the individual defendants, it declined to decide whether those defendants could be liable themselves under section 203. (JA 118). Should this Court reverse, the individual defendants' liability should be determined by the district court on remand.

18

people exchange information in the form of software," it qualifies as an "interactive computer service." (JA 120-22). Second, the court determined that the government's claim sought to treat the EZ Lynk defendants as "publisher[s]" of third-party delete tunes because, "[i]n the absence of the emissions-defeating software created by third parties, and the EZ Lynk Defendants' publication and transmission of that software to drivers via the EZ Lynk Cloud, the government would not have a Section 203 claim against the EZ Lynk Defendants." (JA 122).

Finally, the district court rejected the government's allegations that EZ Lynk actively participated in the installation and creation of delete tunes. (JA 123-26). In doing so, the district court concluded the complaint did not adequately allege facts leading to a reasonable inference that EZ Lynk collaborated in the creation of delete tunes with several delete-tune creators. (JA 123-24). The court also rejected the argument that EZ Lynk's encouragement of the use and creation of delete tunes could bring this action outside the ambit of section 230. (JA 123-24). And the court determined that it was not reasonable to infer that EZ Lynk assisted users in installing delete tunes based on the complaint's allegations discussing technical assistance that EZ Lynk's employees provided to customers. (JA 125-26 (citing JA 32-33 ¶¶ 66-67)). Because the district court concluded that all elements of a CDA

19

defense were met, it dismissed the government's Clean Air Act claim.[5]

On July 11, 2024, judgment was entered dismissing the action. (JA 131). This appeal followed. (JA 132).

### Summary of the Argument

The district court erred as a matter of law in concluding that section 230 of the CDA immunizes EZ Lynk from liability under the Clean Air Act for manufacturing and selling the EZ Lynk System, which is primarily a device that plugs into drivers' vehicles and installs software to "delete" vehicle emissions controls. EZ Lynk cannot establish three requirements of the CDA's affirmative defense.

First, the government's claim does not treat delete tunes, which are computer programs, as "information" within the meaning of the CDA. A computer program may in some respects be able to convey information to

---

[5] As to the government's information-request claim under section 208 of the Clean Air Act, the district court held that "[t]he statute is clear" that EZ Lynk is subject to EPA's information-gathering authority and was not immunized by the CDA. (JA 127). But the district court concluded summary judgment was inappropriate because material disputes of fact remained. (JA 128-29). With the section 203 claim dismissed, the parties later stipulated to the dismissal of the section 208 claim with prejudice (JA 130), and the government is not appealing that aspect of the judgment.

20

a person, but it also serves the purpose of instructing a computer to perform certain actions. The government's complaint in this case targets only that functional capacity of delete tunes—namely, their electronic effect of rendering computerized emissions controls inoperative—and thus does not treat the delete tunes as "information," making section 230's immunity inapplicable. *See infra* Point B.1.

Second, the government's complaint does not treat EZ Lynk as a mere "publisher" of third-party content, as the government does not contend EZ Lynk is liable for any action related to deciding whether to block or remove unlawful third-party content. Rather, the government has brought this action seeking to hold EZ Lynk liable for its own conduct—namely, that EZ Lynk manufactures and sells the EZ Lynk System, a defeat device designed to reprogram vehicles' emissions controls by installing emissions-control defeating software. That defeat device consists of three components that work together to disable emissions controls, only one of which, the EZ Lynk Cloud, involves any aspect of distributing third-party content. The EZ Lynk System also includes a physical device to plug into vehicles and a smartphone app to connect the physical device to the cloud server. As a whole, that system violates a legal duty arising from the Clean Air Act, a duty wholly unconnected to any supposed publishing conduct. *See infra* Point B.2.

Third, EZ Lynk cannot show that it is immune under the CDA because its own participation in and encouragement of the development, availability, and use of delete tunes means the information content is not

21

being provided by someone separate from EZ Lynk, as the defense requires. The affirmative defense should not have been considered at this stage of the litigation, as its elements do not appear on the face of the complaint, and that procedural error alone warrants reversal. But in any event, the government's complaint alleges that EZ Lynk directly and materially contributed to the development, availability, and use of unlawful content, which defeats EZ Lynk's ability to obtain immunity under the CDA. *See infra* Point B.3.

For those reasons, the judgment of the district court should be reversed.

## **A R G U M E N T**

### **Standard of Review**

This Court reviews a district court's grant of a motion to dismiss *de novo. Slattery v. Hochul*, 61 F.4th 278, 285-86 (2d Cir. 2023).

"In reviewing a Rule 12(b)(6) dismissal," this Court "must accept as true all nonconclusory factual allegations in the complaint and draw all reasonable inferences in the Plaintiffs' favor." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021). Moreover, "an affirmative defense to a plaintiff's claim for relief [is] not something the plaintiff must anticipate and negate in her pleading." *Perry v. Merit Systems Protection Board*, 582 U.S. 420, 435 n.9 (2017); *accord In re: Nine West LBO Securities Litig.*, 87 F.4th 130, 144 (2d Cir. 2023) ("Plaintiffs are under no obligation to plead facts supporting or negating an

22

affirmative defense in the complaint."). For that reason, affirmative defenses are typically "inappropriate to resolve on a motion to dismiss," *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013), and a defendant may only properly raise an affirmative defense in a pre-answer motion to dismiss if "the defense appears on the face of the complaint," *Michael Grecco Productions, Inc. v. RADesign, Inc.*, 112 F.4th 144, 149 (2d Cir. 2024).

### EZ Lynk Is Not Immune Under the Communications Decency Act for Manufacturing and Selling Emissions-Control Defeating Devices in Violation of the Clean Air Act

The district court correctly determined that the government has stated a claim for violation of section 203 of the Clean Air Act, which makes the manufacture and sale of defeat devices unlawful. 42 U.S.C. § 7522(a)(3)(B); (JA 116-18). As the government alleged in its complaint, the EZ Lynk System's hardware is plugged in to a vehicle and has a "'principal effect'" of "'defeat[ing]'" emissions controls—and EZ Lynk "'knows or should know' that it is 'put to such use.'" (JA 117 (quoting 42 U.S.C. § 7522(a)(3)(B))). EZ Lynk has enabled thousands of drivers to disable the emissions controls on their vehicles, many of whom have shared their stories of doing so on EZ Lynk's own Facebook group and other sites with EZ Lynk's overt approval. (JA 117). Its alleged conduct makes EZ Lynk liable under the Clean Air Act. Nothing in the Communications Decency Act shields EZ Lynk from that liability for manufacturing and selling defeat devices,

23

and the district court erred both procedurally and substantively in concluding otherwise.

## A.  Requirements of the Communications Decency Act's Affirmative Defense

Section 230 of the Communications Decency Act provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The statute "shields a defendant from civil liability" only when three elements are all met: the defendant is "a 'provider or user of an interactive computer service'";[6] the plaintiff's claims "'treat' the defendant as the 'publisher or speaker' of information"; and that information is "'provided by' an 'information content provider' other than the defendant."[7] *Force v. Facebook, Inc.*, 934 F.3d 53, 64 (2d Cir. 2019) (quoting 47 U.S.C. § 230(c)(1); alterations omitted). Section 230 provides an "affirmative defense" to liability; therefore, a

------

[6]  An "interactive computer service" is "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet." 47 U.S.C. § 230(f)(2).

[7]  An "information content provider" is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3).

24

defendant may only properly invoke it to obtain dismissal of a claim if "the statute's barrier to suit is evident from the face of the complaint." *Ricci v. Teamsters Union Local 456*, 781 F.3d 25, 28 (2d Cir. 2015) (quotation marks omitted); *accord Force*, 934 F.3d at 57, 63 n.15.

## B.  EZ Lynk Cannot Establish the Elements of a Section 230 Defense

The district court was incorrect in concluding that EZ Lynk is shielded from liability for its violation of the Clean Air Act by the CDA, as EZ Lynk cannot establish three requirements for that affirmative defense. First, the EZ Lynk System disseminates functional software tools, which are not "information" protected by section 230. Second, the government's Clean Air Act claim does not treat EZ Lynk as the "publisher" of content. And third, the content at issue is not provided by "another" information content provider wholly separate from EZ Lynk.

At bottom, this action is not about publishing information. It is about EZ Lynk's own unlawful conduct— its manufacture and sale of a complete system that includes a hardware component to install delete tunes in vehicles to defeat emission controls, as well as its collaboration with others to create delete tunes specifically for use with the EZ Lynk System, and its actions to encourage their development, availability, and use by EZ Lynk customers. That conduct violates the Clean Air Act, and has nothing to do with the liability shield created by the Communications Decency Act.

25

### 1. The Complaint Does Not Seek to Hold EZ Lynk Liable for Publishing "Information"

To begin with, section 230's immunity does not extend to the EZ Lynk System because the government's claim does not treat the software available on the EZ Lynk Cloud as "information" within the meaning of the CDA. Section 230 limits liability only where a claim treats an interactive computer service "as the publisher or speaker of any *information*." 47 U.S.C. § 230(c)(1) (emphasis added). The EZ Lynk System does not convey "information" in the sense used in section 230—that is, information for a human audience. Rather, it disseminates a tool that uses computerized commands for disabling a vehicle's emission controls. The unlawful functional capacity of that tool is not "information."

Although no court appears to have analyzed whether software is "information" under section 230, in a different context this Court has drawn a distinction between the "functional and expressive elements" of computer software. *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 451 (2d Cir. 2001). In rejecting a First Amendment challenge to an injunction barring dissemination of a computer program, the Court recognized that computer code can "convey information capable of comprehension and assessment by a human being," and thus may "communicat[e] ideas" to those who can read and understand that code. *Id*. at 447-48. But in contrast to communication with people, "communicat[ion] through code . . . to the computer" is "never protected" as speech. *Id*. at 449 (citing *CFTC v.*

26

*Vartuli*, 228 F.3d 94, 111 (2d Cir. 2000)). When received by a computer, code does not "convey information or . . . assert values"; instead, it functions "in an entirely mechanical way" as a "command to a machine" "to induce action" and "electronically trigger[ ]" a response. *Vartuli*, 228 F.3d at 111. "That functional capability is not speech." *Corley*, 273 F.3d at 454.

That same distinction should govern whether a computer program is "information" under the Communications Decency Act.[8] In enacting the CDA's protection for publishing or speaking information, Congress expressed purposes that closely mirror the rationales for constitutional protection of speech. First Amendment protections advance "the pursuit of truth, the accommodation among interests, the achievement of social stability, the exposure and deterrence of abuses of authority, personal autonomy and personality development, or the functioning of a democracy." *Vartuli*, 228 F.3d at 111. Congress through the CDA similarly sought to promote "the availability of educational and informational resources," "a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity," and "a variety of political, educational, cultural, and entertainment services." 47 U.S.C. § 230(a)(1), (3), (5). That Congress intended to protect those types of discourse and communication among people is confirmed by its reference to a "publisher or

_____

[8]   The district court simply stated, without analysis, that "[s]oftware is information, albeit presented in code." (JA 121-22).

27

speaker," terms that strongly suggest communication among people rather than software programs' instructions to computers. *See American Heritage Dictionary of the English Language* (5th ed.) (defining "speak" in terms of "convey[ing] information"); Restatement (Second) of Torts § 577 (1977) ("Publication . . . is . . . communication . . . to one other than the person defamed."). And in its statutory findings Congress reinforced that emphasis on communicating information to people, who benefit from hearing and receiving information. 47 U.S.C. § 230(a)(1) (noting benefits of Internet communication "to individual Americans" and "to our citizens"); (a)(2) (benefits to "users" from "information that they receive"); (a)(4) (noting interactive computer services "have flourished, to the benefit of all Americans"); (b)(3) (stating policy to "maximize user control over what information is received by individuals, families, and schools").

These statutory goals are not advanced by the distribution of the functional aspects of computer programs, demonstrating why delete tunes should not be considered "information" under section 230. The EZ Lynk Cloud does not make delete tunes available because of "whatever capacity [they] might have for conveying information to a human being"—it makes them available because of their "capacity to instruct a computer" to disable vehicle's emissions controls. *Corley*, 273 F.3d at 454.[9] In that sense, delete tunes are no

---

[9]   *Corley* concerned software that, much like a delete tune, was prohibited by Congress because it circumvented technological measures—in that case,

28

different from a physical device manufactured and sold to defeat emissions controls, such as an exhaust pipe designed to bypass a catalytic converter.[10] Both are "target[ed]," *id.*, by the Clean Air Act as a "part or component" for their "principal effect" of defeating emissions controls, 42 U.S.C. § 7522(a)(3)(B), not for any "information" they convey. *See FTC v. LeadClick Media, LLC*, 838 F.3d 158, 176 (2d Cir. 2016) (expressing skepticism that section 230 applies to a defendant because its "purpose was not to encourage discourse"). Thus, just as the functional capacity of the computer program in *Corley* was not "speech," the functional capability of delete tunes to defeat emissions controls is not "information" under section 230, and the protection of that statute does not apply to EZ Lynk.

### 2. The Complaint Does Not Treat EZ Lynk as a Publisher, but as a Manufacturer and Seller of a System That Installs Unlawful Emissions-Control Defeating Software

Nor does the government's Clean Air Act claim "treat" EZ Lynk as the "publisher or speaker" of

––––––––––

encryption or other protections used by copyright holders to prevent unauthorized digital copying of their works.

[10] *See* S. Rep. 101-228 (1989), 1990 U.S.C.C.A.N. 3385, 3509 (noting 1990 amendments to Clean Air Act prohibits "'defeat devices' . . . [that] include 'test tubes' used to replace catalytic converters on vehicles [and] aftermarket computer programmable read-only memory chips . . . .").

29

information, as required for EZ Lynk to establish the section 230 defense. Rather, the alleged liability is based on EZ Lynk's own conduct in manufacturing and selling a defeat device.

A "publisher," as the term is used in the CDA, is "one that makes public," "the reproducer of a work intended for public consumption," "one whose business is publication," or more broadly, one engaged in "arranging and distributing" information. *Force*, 934 F.3d at 65-66 (quotation marks omitted). "At its core, § 230 bars lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content." *LeadClick*, 838 F.3d at 174 (quotation marks omitted; quoting *Jones v. Dirty World Entertainment Recordings LLC*, 755 F.3d 398, 407 (6th Cir. 2014), and *Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)).

In short, a claim seeks to "treat[ ]" a website provider as "the publisher or speaker" of third-party content if liability turns on the provider's failure to block or remove unlawful content from its platform: "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online." *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1170-71 (9th Cir. 2008) (en banc); *accord id.* at 1174 (section 230 "enacted to protect websites against the evil of liability for failure to remove offensive content"); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1359 (D.C. Cir. 2014) ("the

30

very essence of publishing is making the decision whether to print or retract a given piece of content").[11]

But a claim that seeks to hold a defendant accountable for other aspects of its own conduct does not "treat" the defendant as a "publisher or speaker," even if third-party content is involved. *See Erie Insurance Co. v. Amazon.com, Inc.*, 925 F.3d 135, 139-40 (4th Cir. 2019) (no CDA immunity where claim is based on defendant's conduct separate from publication of another's speech); *Roommates.com*, 521 F.3d at 1165 (no CDA immunity for defendant's "own acts" in soliciting and developing third-party content). Accordingly, "courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.'" *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102, 1107 (9th Cir. 2009) (no CDA bar where claim is based in defendant's alleged promise to remove content, because "legal duty [is] distinct from the conduct at hand").

Here, the government's complaint alleges that EZ Lynk violated the Clean Air Act through its own acts—conduct that is entirely separate from any purported "publishing" decision to retain or remove third-party content on the EZ Lynk Cloud. The EZ Lynk

_____

[11] That section 230(c) is focused on the decision to block or remove material is confirmed by its caption— "Protection for 'Good Samaritan' blocking and screening of offensive material." *See INS v. St. Cyr*, 533 U.S. 289, 308-09 (2001) (statute's caption may clarify ambiguity in its terms).

31

System, the defeat device that EZ Lynk manufactured and sold, consists of all three components—the Auto Agent physical device, the Auto Agent App smartphone software, and the EZ Lynk Cloud—that work together to disable vehicles' emissions controls. (JA 13-14 ¶ 1); *see* U.S. Patent No. 10,037,633, at 1, *available at* https://perma.cc/P9RT-6DKG. As described above, the Auto Agent plugs into a vehicle's onboard diagnostic port in order to enable EZ Lynk customers to install delete tunes using the smartphone-based Auto Agent App. (JA 25 ¶ 47, JA 25-26 ¶ 48, JA 27 ¶ 52).

Even if the EZ Lynk Cloud, where delete tunes are stored for users to download, appears similar to a content platform, the government's Clean Air Act claim does not seek to hold the defendants liable for failure to remove tunes from the cloud. Rather, the government's claim is based on EZ Lynk's knowing manufacture and sale of an unlawful product: the EZ Lynk System in its entirety. The storage of delete tunes on the EZ Lynk Cloud, which is merely one of the system's functionalities involving one of its three main components, is not the basis for liability in this case. Because the manufacturing and selling conduct that violates the legal duty arising under the Clean Air Act is distinct from any publishing conduct, section 230 does not shield EZ Lynk from liability.

More specifically, in designing the EZ Lynk System to reprogram emissions controls, manufacturing its hardware component with the capability of installing delete tunes, and selling the EZ Lynk System to tens of thousands of drivers, EZ Lynk is not "deciding

32

whether to publish, withdraw, postpone or alter" information created by third parties. *LeadClick*, 838 F.3d at 174 (quotation marks omitted). The presence of third-party content as part of the EZ Lynk System's process of defeating emissions controls does not immunize EZ Lynk: section 230 "does not provide a general immunity against all claims derived from third-party content," and does not apply when a legal claim "has nothing to do with [the defendant's] efforts, or lack thereof, to edit, monitor, or remove" such third-party content. *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 852-53 (9th Cir. 2016) (quotation marks omitted); *accord G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 567 (7th Cir. 2023) ("the fact that publishing was involved somewhere . . . does not mean that [defendant] can successfully use Section 230(c) to shield itself from liability"); *see Erie Insurance*, 925 F.3d at 140 (no immunity from product-liability suit for sale of a third-party product on website: "[T]he Communications Decency Act protects interactive computer service providers from liability *as a publisher of speech*, [but] it does not protect them from liability as the seller of a defective product."). Even when a defendant in fact does "act as a publisher of third-party content" in some respect, there is no CDA immunity when "the underlying legal duty at issue [does] not seek to hold the defendant liable as a 'publisher or speaker' of third-party content." *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019); *accord Barnes*, 570 F.3d at 1107. That is the case here.

The district court erred in reaching the opposite conclusion. It reasoned that "[i]n the absence of the emissions-defeating software created by third parties,

33

and the EZ Lynk Defendants' publication and transmission of that software to drivers via the EZ Lynk Cloud, the government would not have a Section 203 claim against the EZ Lynk Defendants." (JA 122). But the mere involvement of third-party software does not mean CDA immunity applies, even if that third-party content was a necessary part of the facts underlying the legal claim: "To be held liable for information 'as the publisher or speaker' means more than that the publication of information was a but-for cause of the harm." *Henderson v. Source for Public Data, L.P.*, 53 F.4th 110, 122 (4th Cir. 2022); *accord HomeAway.com*, 918 F.3d at 682 (rejecting "a 'but-for' test that would provide immunity under the CDA solely because a cause of action would not otherwise have accrued but for the third-party content"); *see Roommates.com*, 521 F.3d at 1165 ("The CDA does not grant immunity for inducing third parties to express illegal preferences.").

It is what EZ Lynk does with that third-party software—namely, provide the tools necessary, through the whole EZ Lynk System, to access the software from the EZ Lynk Cloud and install it in vehicles using the Auto Agent and Auto Agent App to defeat emissions controls—that forms the basis of the government's Clean Air Act claim. The district court reasoned that even though the EZ Lynk System is designed and used to acquire and install delete tunes, EZ Lynk is simply "'distributing' information, which is precisely what Section 230 immunizes." (JA 123). But the government's complaint alleges that the EZ Lynk System must be seen as a whole system of all three components working together. (JA 25-29 ¶¶ 47-56). As such, EZ Lynk does far more than make third-party content

34

available; by allowing its customers to install delete tunes, EZ Lynk knowingly makes that software accessible and usable for unlawful purposes. Indeed, the entire point of the EZ Lynk System, as the complaint alleges and as the district court recognized, is to illegally evade emissions controls—a purpose that is unaltered by the fact that EZ Lynk outsources the software component to third parties on a cloud-based platform. No matter where the delete tunes are stored or who creates them, their installation with the EZ Lynk System requires a physical electronic device with technical design features that allow it to "access[ ] deeper into the vehicle's computers" to override or reprogram a vehicle's computerized emissions controls. (JA 25-26 ¶¶ 47-48, JA 29 ¶ 55, *see also* JA 27-28 ¶ 54 (showing multi-step installation process involving: "Preparing for installation"; "Unlocking controller"; "Erasing controller"; and "Installing" delete tune)). Because the government's complaint describes this whole process as the basis for its Clean Air Act claim, it does not treat EZ Lynk as a publisher or distributor; it treats EZ Lynk as the manufacturer and seller of defeat devices.

Nor, for similar reasons, was the district court correct to contend that the "government faults the EZ Lynk Defendants for making the software publicly available." (JA 122). To the contrary, the complaint makes clear that it is the presence of the whole EZ Lynk System that makes it possible to install the delete tunes and thus to defeat emissions controls. (JA 25-26 ¶ 48, JA 25 ¶ 50). Instead, the government "faults" EZ Lynk for "violat[ing] the Clean Air Act— and put[ting] the public's health at risk—by manufacturing and selling a product that allows drivers to

35

illegally disable their motor vehicle's emissions controls at the push of a button." (JA 13-14 ¶ 1). That claim does not treat EZ Lynk as a publisher, but rather seeks to hold EZ Lynk accountable for its separately unlawful conduct.

### 3. EZ Lynk's Participation in the Development and Use of Delete Tunes Means Section 230 Immunity Does Not Apply

EZ Lynk also cannot establish a separate prong of its affirmative defense: that the government's claim "be based on content provided by *another* information content provider" besides EZ Lynk itself. *LeadClick*, 838 F.3d at 174. The CDA's "grant of immunity applies only if the interactive service provider is not also an 'information content provider' of the content which gives rise to the underlying claim." *Id*. A service provider becomes an "information content provider" if it is "responsible, in whole or in part," for the creation or development of the information content at issue, 47 U.S.C. § 230(f)(3)—meaning it is "more than a neutral conduit for that content." *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1199 (10th Cir. 2009). Thus, a defendant is "not entitled to immunity" if it has, in courts' various formulations, "participated in the development of the [unlawful] content," "assisted in the development of what made the content unlawful," "'materially contribut[ed] to the content's alleged unlawfulness,'" *LeadClick*, 838 F.3d at 174, 176 (quoting *Roommates.com*, 521 F.3d at 1168; alteration omitted)); "specifically encourage[d] development of what is offensive about the content," *Accusearch*, 570 F.3d at

36

1199; or developed unlawful content as part of "a collaborative effort," *Roommates.com*, 521 F.3d at 1167.

The government's complaint alleges that EZ Lynk was on the wrong side of that line. As alleged, EZ Lynk was active in the development of the unlawful delete tunes: it collaborated directly with delete-tune creators, provided technical assistance to drivers installing delete tunes, and encouraged and supported drivers' use of delete tunes to defeat vehicle emissions controls. That conduct made the EZ Lynk System much more than "neutral with respect to the offensiveness of the content," and therefore "responsible" for it. *Accusearch*, 570 F.3d at 1199.

The district court dismissed the government's allegations as insufficient to "nullify[ ] immunity" under section 230. But the government was not required to "nullify[ ]" EZ Lynk's CDA affirmative defense at the pleading stage. *Michael Grecco*, 112 F.4th at 154 ("plaintiffs are under *no obligation* to plead facts supporting or negating an affirmative defense in the complaint" (alterations and quotation marks omitted)). A defendant bears the burden of establishing an affirmative defense, and may only raise it in a motion to dismiss under Rule 12(b)(6) if "the defense appears on the face of the complaint." *Id.* at 149; *accord In Re: Nine West*, 87 F.4th at 144; *Perry*, 582 U.S. at 435 n.9. Thus the district court was wrong to fault the government for failing to "anticipate the Section 230 immunity" and for "not seek[ing] leave to amend" once the CDA affirmative defense was raised in EZ Lynk's motion to dismiss. (JA 126 n.7); *contra Michael Grecco*, 112 F.4th at 154 (plaintiff's complaint "needed to plausibly

37

allege a claim" but "did not need to allege, plausibly or otherwise," that an affirmative defense would be negated). The government had no obligation to plead that EZ Lynk itself acted as an information content provider by materially contributing to the illegality of the delete tunes available on the EZ Lynk Cloud.

In any event, the government did allege that EZ Lynk directly and materially contributed to the development of delete tunes. First, the government's complaint alleges that EZ Lynk "regularly collaborate[s] with technicians [i.e., the creators of delete tunes] to ensure that delete tunes capable of effectively disabling emissions controls are readily available to drivers using the EZ Lynk System." (JA 29 ¶ 57). The complaint alleges that the delete tunes available on the EZ Lynk Cloud are created specifically for use with the EZ Lynk System. (JA 26 ¶ 50). Indeed, EZ Lynk provides delete-tune creators with "a free, cloud-based software program called the EZ Lynk ECU Profile Editor" that enables them to create delete tunes for use with the EZ Lynk System. (JA 30 ¶ 59). EZ Lynk "previewed the EZ Lynk System" for PPEI, a creator of delete tunes, and "PPEI was involved in the early stages of testing the EZ Lynk System approximately two years before the system's launch in 2016." (JA 29 ¶ 58). EZ Lynk again previewed the EZ Lynk System for PPEI in 2018, before EZ Lynk launched an updated version of the Auto Agent device. (JA 29 ¶ 58). In addition, the complaint identifies PPEI delete tunes created for use with the EZ Lynk System. (JA 27-28 ¶¶ 53-54, *see also* JA 33-36 ¶¶ 68, 71, 74, 75, 76).

38

And the complaint alleges additional collaboration between PPEI and EZ Lynk involving use of the EZ Lynk System to install delete tunes: PPEI's owner has worked with EZ Lynk representatives to administer the EZ Lynk Forum, a Facebook group maintained by EZ Lynk as a resource for drivers seeking "information and support for everything related to the EZ Lynk Auto Agent." (JA 31 ¶ 64). Indeed, PPEI has worked with EZ Lynk Technical Support Representatives to troubleshoot drivers' issues installing PPEI delete tunes using the EZ Lynk System and to provide technical assistance to drivers deleting emissions controls. (JA 32-33 ¶ 67).

Separately, the government's complaint alleges that EZ Lynk provided technical assistance to drivers to support deletion of emissions controls. In addition to the driver whose problems installing a PPEI delete tune were addressed by EZ Lynk and PPEI representatives, the government described other examples of EZ Lynk's technical assistance with delete tunes. (JA 32-33 ¶ 67). In one instance, a driver posted to the EZ Lynk Forum, describing how dashboard malfunction indicator lights illuminated after a delete tune was installed using the EZ Lynk System; EZ Lynk's Technical Support Representative provided several long and detailed responses about how to fix the problem. (JA 32-33 ¶ 67). The driver wrote: "[p]roblems fixed with the help of EZ Lynk's Technical Support Representative and hpp tunes." (JA 32-33 ¶ 67).

The district court incorrectly assumed that this last example failed to show that "anyone affiliated with the EZ Lynk Defendants helped the driver install the

39

emissions-deleting software" simply because the "problem" EZ Lynk's Technical Support Representative responded to involved "Malfunction Indicator Lights." (JA 125). But solving a problem with the vehicle's functioning that followed from installation of delete tunes is easily understood as assisting with the installation of delete tunes. More specifically, as alleged in the complaint, the malfunction indicator light is an Emission-Related Element of Design, and delete tunes may prevent that light from illuminating. (JA 26 ¶ 49). By addressing the malfunction lights, the EZ Lynk Technical Support Representative thus "fixed" the driver's problems, thereby achieving a successful installation of delete tunes. And the district court altogether ignored the complaint's other allegations of technical support for defeating emissions controls. (JA 32-33 ¶ 67).

In addition, the complaint alleges that "EZ Lynk's own representatives have explicitly approved of the use of the EZ Lynk System to 'delete' emissions controls" on the EZ Lynk Forum. (JA 32 ¶ 66). As alleged, EZ Lynk representatives "loved" posts about a driver who "[f]inally made the jump and deleted" a truck's emission controls with the EZ Lynk System, and a driver who "[c]ouldn't be happier with my ez lynk" after the driver's truck showed "huge improvement with the deletes and new tunes." (JA 32 ¶ 66).[12] All these

_____

[12] The district court minimized these allegations by stating the EZ Lynk representatives were "not the EZ Lynk Defendants," a defined term that included the EZ Lynk, SEZC, company. (JA 108, 124). But the

40

actions taken together—giving delete-tune creators access to the EZ Lynk System to help them develop their software; helping customers install that software to achieve its unlawful purpose of disabling emissions controls; and expressly approving customers' use of the EZ Lynk System to install delete tunes on their vehicles—demonstrate that EZ Lynk was much more than a "neutral conduit" for delete tunes; it was responsible for that content as an active participant and material contributor to its availability and use on the EZ Lynk System. *Accusearch*, 570 F.3d at 1199. "One who builds a highway is [not] 'responsible' for the use of that highway by a fleeing bank robber," *id.*—but one who consults in advance with robbers about how the road is designed and where it goes, provides roadside assistance to them in the aftermath of a heist, and waves encouragement at fleeing thieves is indeed responsible and has materially contributed to the offensiveness of the use of the highway.

The district court reasoned the government had not alleged "that the EZ Lynk Defendants create delete tunes" and had not pleaded facts sufficient to support an inference that EZ Lynk "participated in the *creation of delete tunes*." (JA 123-24 (emphasis in original)). Setting aside the fact that the government has no burden to negate this prong of EZ Lynk's CDA affirmative defense, the district court misstated the applicable standard. In order to establish immunity, EZ Lynk

---

company is responsible for the acts of its employees. *Cf. Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 755-56 (1998).

41

must show that it did not "materially contribut[e] to the content's alleged unlawfulness," *LeadClick*, 838 F.3d at 176 (quotation marks and alterations omitted), "specifically encourage[ ] development of what is offensive about the content," *Accusearch*, 570 F.3d at 1199, or join a "collaborative effort" to develop unlawful content, *Roommates.com*, 521 F.3d at 1167—not merely that it did not actually create or participate in creating the delete tunes. Even "advising" a third party on unlawful content can be part of a material contribution. *LeadClick*, 838 F.3d at 171, 176. As explained above, the complaint alleges that EZ Lynk collaborated with creators of delete tunes to ensure they worked to defeat emissions controls and were available on the EZ Lynk Cloud; previewed the EZ Lynk System for delete-tune creators so they could test and assist development of the system and create delete tunes specifically for the EZ Lynk System; and generally encouraged the development of delete tunes by, on its own and in cooperation with delete-tune creators, providing drivers with information and support in their installation of emissions-control defeating software.

Taken "as a whole," with "all reasonable inferences" drawn in the government's favor, the complaint's allegations are more than sufficient to demonstrate that EZ Lynk materially contributed to the development and illegal use of this software. *Rich v. Fox News Network, LLC*, 939 F.3d 112, 122 n.5 (2d Cir. 2019). At the least, the complaint "raise[s] a reasonable expectation that discovery will reveal evidence of illegality" and must therefore survive EZ Lynk's motion to dismiss. *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (alteration and quotation

42

marks omitted). The need to proceed to discovery is particularly acute in this case, where EZ Lynk refused to produce information responsive to EPA's lawful information requests, including requests seeking "information about EZ Lynk's business relationships with the technicians who write and sell tunes for use with the EZ Lynk System"; "information about EZ Lynk's sales of tokens to technicians to enable them to transmit delete tunes to drivers (such as the quantity of tokens sold or to whom)"; and information about "the methods by which EZ Lynk provides technical support to drivers (including about how to use the EZ Lynk System to defeat emissions controls)." (JA 38-39 ¶ 84). Discovery will allow the development of a full record concerning EZ Lynk's contributions to and participation in the development and availability of delete tunes.[13]

In the meantime, however, the government's allegations in the complaint must be accepted as true, and all reasonable inferences must be drawn in its favor. As alleged, EZ Lynk's conduct "far exceeded that of neutral assistance." *LeadClick*, 838 F.3d at 176.

---

[13] As noted above, the district court held that EZ Lynk is subject to EPA's information-gathering authority, but did not resolve the government's claim in this regard. (JA 127-29). The government agreed to dismiss that claim with prejudice in order to pursue this appeal. But the EPA's deprivation of information to which it is lawfully entitled is still relevant and can be addressed by permitting discovery in this civil action.

43

EZ Lynk participated in and encouraged the development of delete tunes to ensure their availability to buyers of the EZ Lynk System, then assisted those customers in acquiring and installing the delete tunes, using the necessary hardware and software components that EZ Lynk itself developed, manufactured, and sold. The government's claim under the Clean Air Act seeks to hold EZ Lynk responsible for that unlawful conduct, which is not immunized by the Communications Decency Act.

## CONCLUSION

**The judgment of the district court should be reversed.**

Dated:   New York, New York
         November 8, 2024

                    Respectfully submitted,

                    DAMIAN WILLIAMS,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for Plaintiff-Appellant.*

MÓNICA P. FOLCH,
JENNIFER JUDE,
ZACHARY BANNON,
BENJAMIN H. TORRANCE,
    *Assistant United States Attorneys,*
            *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 10,448 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: MÓNICA P. FOLCH,
*Assistant United States Attorney*

**ADDENDUM**

Add. 1

**Statutes**

**42 U.S.C. § 7522. Prohibited acts**

(a) Enumerated prohibitions

The following acts and the causing thereof are prohibited—

. . . .

   (3)

      (A) for any person to remove or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter prior to its sale and delivery to the ultimate purchaser, or for any person knowingly to remove or render inoperative any such device or element of design after such sale and delivery to the ultimate purchaser; or

      (B) for any person to manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use;

      . . . .

Add. 2

## 47 U.S.C. § 230. Protection for private blocking and screening of offensive material

(a) Findings

The Congress finds the following:

(1) The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

(2) These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

(3) The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

(4) The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

(5) Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

(b) Policy

It is the policy of the United States—

(1) to promote the continued development of the Internet and other interactive computer services and other interactive media;

Add. 3

(2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

(3) to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

(4) to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

(5) to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

(c) Protection for "Good Samaritan" blocking and screening of offensive material

(1) Treatment of publisher or speaker

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

(2) Civil liability

No provider or user of an interactive computer service shall be held liable on account of—

(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or

Add. 4

otherwise objectionable, whether or not such material is constitutionally protected; or

(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

. . . .

(f) Definitions

As used in this section:

(1) Internet

The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

(2) Interactive computer service

The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

(3) Information content provider

The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

Add. 5

(4) Access software provider

The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

(A) filter, screen, allow, or disallow content;

(B) pick, choose, analyze, or digest content; or

(C) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.