# 24-2386

*To Be Argued By*:
MÓNICA P. FOLCH

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 24-2386

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

—v.—

EZ LYNK, SEZC, PRESTIGE WORLDWIDE SEZC,
THOMAS WOOD, BRADLEY GINTZ,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR PLAINTIFF-APPELLANT

EDWARD Y. KIM,
*Acting United States Attorney for
the Southern District of New York,
Attorney for Plaintiff-Appellant.*
86 Chambers Street, 3rd Floor
New York, New York 10007
(212) 637-6559

MÓNICA P. FOLCH,
JENNIFER JUDE,
ZACHARY BANNON,
BENJAMIN H. TORRANCE,
  *Assistant United States Attorneys,*
    *Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .   1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

POINT I— EZ Lynk Is Not Immune
Under the CDA . . . . . . . . . . . . . . . . . . . . . . . . .   3

    A.  CDA Immunity Is an
Affirmative Defense . . . . . . . . . . . . . . . . . . .   3

    B.  Delete Tunes Are Not "Information"
Protected Under the Communications
Decency Act . . . . . . . . . . . . . . . . . . . . . . . . .   5

    C.  The Complaint Does Not Treat
EZ Lynk as a Publisher . . . . . . . . . . . . . .   11

    D.  EZ Lynk Participated in the
Development and Use of Delete Tunes . . .   14

POINT II—The Complaint Adequately Alleges
That EZ Lynk Is Liable Under the
Clean Air Act . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

    A.  The EZ Lynk System Is a "Part or
Component Intended for Use with"
Vehicles . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

    B.  "A Principal Effect" of the EZ Lynk
System Is to Defeat Emissions Controls . .   23

    C.  EZ Lynk Knew or Should Have Known
That the EZ Lynk System Was Used by
Customers to Defeat Emissions Controls .   25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

ii

# TABLE OF AUTHORITIES

*Cases*:

*Apollo Fuel Oil v. United States,*
    195 F.3d 74 (2d Cir. 1999) . . . . . . . . . . . . . . . . . 27

*In re Apple Inc. App Store Simulated*
    *Casino-Style Games Litigation,*
    625 F. Supp. 3d 971 (N.D. Cal. 2022) . . . . . . . . . 13

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009). . . . . . . . . . . . . . . . . . . . . 17, 27

*Bank of China, New York Branch v. NBM LLC,*
    359 F.3d 171 (2d Cir. 2004) . . . . . . . . . . . . . . . . 27

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007). . . . . . . . . . . . . . . . . . . . . . . . 17

*CFTC v. Vartuli,*
    228 F.3d 94 (2d Cir. 2000) . . . . . . . . . . . . . . . . 6, 7

*Cianci v. New Times Publishing Co.,*
    639 F.2d 54 (2d Cir. 1980) . . . . . . . . . . . . . . . . . 10

*Coffee v. Google, LLC,*
    2021 WL 493387 (N.D. Cal. Feb. 10, 2021). . . . . . 8

*Diep v. Apple, Inc.,*
    2024 WL 1299995 (9th Cir. Mar. 27, 2024). . . . . . 8

*Evans v. Hewlett-Packard Co.,*
    No. C 13-02477, 2013 WL 5594717
    (N.D. Cal. Oct. 10, 2013). . . . . . . . . . . . . . . . . . . 8

iii

PAGE

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC,*
521 F.3d 1157 (9th Cir. 2008) . . . . . . . . . . . . . . . 4

*Food Marketing Institute v. Argus Leader Media,*
588 U.S. 427 (2019). . . . . . . . . . . . . . . . . . . . . 10, 20

*Force v. Facebook, Inc.,*
934 F.3d 53 (2d Cir. 2019) . . . . . . . . . . . . . . . 3, 11

*Free Kick Master LLC v. Apple Inc.,*
140 F. Supp. 3d 975 (N.D. Cal. 2015) . . . . . . . . . 8

*FTC v. LeadClick Media, LLC,*
838 F.3d 158 (2d Cir. 2016) . . . . . . . . . . . . . 12, 14

*Green v. America Online (AOL),*
318 F.3d 465 (3d Cir. 2003) . . . . . . . . . . . . . . 9, 25

*Kaplan v. Lebanese Canadian Bank, SAL,*
999 F.3d 842 (2d Cir. 2021) . . . . . . . . . . . . . 15, 17

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,*
591 F.3d 250 (4th Cir. 2009) . . . . . . . . . . . . . . 4, 5

*In re: Nine West LBO Securities Litig.,*
87 F.4th 130 (2d Cir. 2023) . . . . . . . . . . . . . . . 5

*Perry v. Merit Systems Protection Board,*
582 U.S. 420 (2017). . . . . . . . . . . . . . . . . . . . . . 5

*Ricci v. Teamsters Union Local 456,*
781 F.3d 25 (2d Cir. 2015) . . . . . . . . . . . . . . . . 4, 6

*Stratton Oakmont, Inc. v. Prodigy Services Co.,*
No. 31063/94, 1995 WL 323710
(N.Y. Sup. Ct. May 24, 1995) . . . . . . . . . . . . . . . 11

iv

PAGE

*United States ex rel. Vavra v.*
    *Kellogg Brown & Root, Inc.*,
    727 F.3d 343 (5th Cir. 2013) . . . . . . . . . . . . . . . . 28

*United States ex rel. Vavra v.*
    *Kellogg Brown & Root, Inc.*,
    848 F.3d 366 (5th Cir. 2017) . . . . . . . . . . . . . . . . 28

*United States v. eBay Inc.*,
    2024 WL 4350523 (E.D.N.Y. Sept. 30, 2024) . . . 18

*Universal City Studios, Inc. v. Corley*,
    273 F.3d 429 (2d Cir. 2001) . . . . . . . . . . . . . . . 6, 7

*Zeran v. America Online, Inc.*,
    129 F.3d 327 (4th Cir. 1997) . . . . . . . . . . . . . . . . 6

*Statutes:*

42 U.S.C. § 7521 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

42 U.S.C. § 7522 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

47 U.S.C. § 230 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Legislative History:*

H.R. Conf. Rep. 104-458 (1996) . . . . . . . . . . . . . . . . 11

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 24-2386

————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

—v.—

EZ LYNK, SEZC, PRESTIGE WORLDWIDE SEZC,
THOMAS WOOD, BRADLEY GINTZ,

*Defendants-Appellees.*

————————

## REPLY BRIEF FOR PLAINTIFF-APPELLANT

————————

### Preliminary Statement

EZ Lynk manufactures and sells the EZ Lynk System, which includes a device EZ Lynk customers plug into their vehicles to install emissions-control defeating software stored on EZ Lynk's cloud-based platform. As alleged, EZ Lynk collaborates with creators of emissions-control defeating software (referred to as "delete tunes") to ensure that delete tunes created specifically for use with the EZ Lynk System are readily available for EZ Lynk's customers. EZ Lynk also maintains an online forum where EZ Lynk customers post about "delet[ing]" their vehicles' emissions controls

2

using the EZ Lynk System, and where EZ Lynk representatives provide technical assistance to customers using the EZ Lynk System to defeat emissions controls. (JA 32 ¶ 66).

The district court correctly concluded that that the government's allegations were sufficient to state a claim under the Clean Air Act. But the court went on to focus on EZ Lynk's hosting of third-party delete tunes on its cloud-based platform—and ignore EZ Lynk's manufacturing and selling a system that installs delete tunes—to erroneously conclude that EZ Lynk is immune from liability under section 230 of the Communications Decency Act ("CDA").

The CDA does not apply. EZ Lynk is not acting as a "publisher," as required for CDA immunity, when it manufactures and sells a device that physically plugs into vehicles, accesses their computer systems, and installs emissions-control defeating delete tunes. And delete tunes, which reprogram vehicles' computer systems, are not the type of communicative information Congress sought to protect under the CDA. Moreover, EZ Lynk's attempt to argue that it had nothing to do with the creation of delete tunes depends on ignoring or contradicting the government's numerous allegations that EZ Lynk collaborated with delete-tune creators, and assisted and encouraged drivers to install delete tunes. EZ Lynk's arguments raise issues of fact, which require discovery to resolve. The district court's judgment that EZ Lynk is entitled to section 230 immunity should be reversed.

EZ Lynk also challenges the district court's correct conclusion that the complaint adequately pleads EZ

3

Lynk's liability under the Clean Air Act for manufacturing and selling the EZ Lynk System. To the contrary, the government's complaint alleges all elements of such liability: that the EZ Lynk System is a "part or component intended for use with" a motor vehicle, that it has "a principal effect" of defeating emissions controls, and that EZ Lynk knew or should have known that the EZ Lynk System was put to such use. Indeed, the complaint alleges that thousands of drivers use the EZ Lynk System with their vehicles to defeat emissions controls—and that EZ Lynk manufactures and sells the EZ Lynk System for just that purpose, and encourages drivers to use it in that way. The government's complaint is more than sufficient to plead a Clean Air Act violation, and this action should be remanded to proceed to discovery.

## A R G U M E N T

### POINT I

### EZ Lynk Is Not Immune Under the CDA

The district court's section 230 holding was wrong—procedurally, because an affirmative defense should not be decided unless it is apparent from the face of the complaint, and on the merits.

### A.   CDA Immunity Is an Affirmative Defense

This Court has held that "Section 230 provides an affirmative defense to liability." *Force v. Facebook, Inc.*, 934 F.3d 53, 72 (2d Cir. 2019); *accord id.* at 57, 62, 63 n.15 (repeatedly describing section 230 as an

4

"affirmative defense"); *Ricci v. Teamsters Union Local 456*, 781 F.3d 25, 28 (2d Cir. 2015). In doing so, it has applied the usual rule that a defendant bears the burden of establishing an affirmative defense, and may only raise it in a motion to dismiss under Rule 12(b)(6) if the defense appears on the face of the complaint. *See Ricci*, 781 F.3d at 28 ("'[p]reemption under the Communications Decency Act is an affirmative defense, [that] can . . . support a motion to dismiss if the statute's barrier to suit is evident from the face of the complaint.'" (quoting *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014) (also addressing section 230); alteration omitted)).

EZ Lynk is thus wrong that "[n]one of the cited authorities [the government] relies on about affirmative defenses analyze Section 230." (Brief for Defendants-Appellees ("Def. Br.") 32). While EZ Lynk notes that the Fourth Circuit has stated it "aim[s] to resolve the question of § 230 immunity at the earliest possible stage of the case" to avoid "'costly and protracted legal battles,'" the court in that case applied the usual test for assessing the plausibility of a complaint's allegations, concluding that the plaintiff's claim must fail on the face of its complaint. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255-60 (4th Cir. 2009) (quoting *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1170-71 (9th Cir. 2008) (en banc)).[1] None of that is

---

[1]   Notably, the claims in *Nemet*, for "defamation and tortious interference with a business expectancy," required the plaintiff to demonstrate that the defend-

5

inconsistent with this Court's usual rule for affirmative defenses.

EZ Lynk has thus not shown why the CDA should be treated differently from other affirmative defenses, and courts routinely apply these standards regardless of the particular defense raised. *See, e.g.*, *Perry v. Merit Systems Protection Board*, 582 U.S. 420, 435 n.9 (2017) (release of claims); *In re: Nine West LBO Securities Litig.*, 87 F.4th 130, 144 (2d Cir. 2023) (Bankruptcy Code section 546(e)). EZ Lynk cannot invoke section 230 immunity because the elements of that affirmative defense are not evident from the face of the government's complaint.

## B. Delete Tunes Are Not "Information" Protected Under the Communications Decency Act

EZ Lynk claims that software posted on the internet is automatically protected as "information." (Def. Br. 35). But as this Court has recognized, software may have both functional and expressive elements. The protection it receives depends on which of those elements is at stake.

––––––––––

ant had authored the content—a question that heavily overlaps with whether the defendant was an "information content provider," the only disputed issue under section 230. 591 F.3d at 252-53. That overlap made the CDA's affirmative defense particularly amenable to being addressed on the face of the complaint.

6

This Court has not examined whether software is "information" under the CDA. However, in the First Amendment context, it has held that software that "convey[s] information capable of comprehension and assessment by a human being" is entitled to protection, while mechanical commands issued through code to a computer are not. *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 448 (2d Cir. 2001); *accord CFTC v. Vartuli*, 228 F.3d 94, 111 (2d Cir. 2000). The CDA was enacted with a "speech-protective purpose" to advance goals similar to those of the First Amendment: "'Congress recognized the threat that tort-based lawsuits pose to freedom of speech in the new and burgeoning Internet medium. Section 230 was enacted, in part, to maintain the robust nature of Internet communication . . . .'" *Ricci*, 781 F.3d at 28 (quoting *Zeran v. America Online, Inc.*, 129 F.3d 327, 330-31 (4th Cir. 1997)). Accordingly, the distinction the Court has drawn in *Corley* and *Vartuli* should guide the analysis of whether the CDA protects software posted on the internet.

EZ Lynk states that *Corley* and *Vartuli* "limited First Amendment protections to certain types of software . . . because otherwise, any software that violated the law could not be regulated." (Def. Br. 38). That assertion not only misreads those cases (and cites no part of them to support that theory), but misunderstands constitutional law. Courts do not limit constitutional protections in order to assure that regulations can be enforced. The decisions instead determined the proper scope of speech protection in light of the First Amendment's purposes; analogously, this Court should now

7

determine the proper scope of the CDA's protection of "information."

Delete tunes created specifically to be installed using the EZ Lynk System do not convey "information" capable of assessment or understanding by EZ Lynk customers. Rather, they use computerized commands to disable vehicle emissions controls. That makes them "[u]nlike a blueprint or a recipe," which require human comprehension to be useful; instead, delete tunes "can instantly cause a [vehicle's] computer to accomplish tasks" with no or minimal human action. *Corley*, 273 F.3d at 451. Like the program in *Vartuli*, a delete tune operates in an "entirely mechanical way." 228 F.3d at 111. Such a program does not implicate the "speech-protective purpose" of the CDA.

On appeal, EZ Lynk does not claim that delete tunes convey ideas to be evaluated by drivers acquiring them. Rather, EZ Lynk points to decisions concluding that posting of specific software is protected under the CDA. (Def. Br. 35-36). The decisions EZ Lynk cites are nonprecedential dispositions—either summary orders by courts of appeals, or decisions of district courts—that do not analyze the question of what software may be protected "information" in any depth. Moreover, they appear to be distinguishable, as they involve software applications requiring human comprehension and assessment. *See Corley*, 273 F.3d at 449 n.23 (under *Vartuli*, neither "programming commands as triggers" nor a program's entirely mechanical communication to a person is "speech" (quotation marks omitted)). For example, in the unpublished memorandum decision in *Diep v. Apple, Inc.*, the Ninth Circuit stated

8

—without discussion—that a third-party cryptocurrency services application was "information" under the CDA. No. 22-16514, 2024 WL 1299995, at *1 (9th Cir. Mar. 27, 2024). That application purported to allow individuals to store, access, and use cryptocurrencies they owned. *Diep v. Apple, Inc.*, 2023 WL 6627346, at *4 (Appellee Br.). Thus, the software was not merely mechanically performing a function invisible to the consumer; it was receiving and providing information to human users. Similarly, in *Free Kick Master LLC v. Apple Inc.*—a district court decision that applied section 230 to a game app with no analysis of whether the app was covered "information"—the app in question presumably worked, like all computer games, through interactions with its user. 140 F. Supp. 3d 975, 978 (N.D. Cal. 2015). While the unpublished district court decision in *Coffee v. Google, LLC* did address whether apps are covered "speech" or "information," its cursory discussion simply relied on a different unpublished district court decision that applied the CDA to an app, and that latter decision itself contained no analysis of the issue. No. 20 Civ. 3901, 2021 WL 493387, at *6 (N.D. Cal. Feb. 10, 2021) (citing *Evans v. Hewlett-Packard Co.*, No. C 13-02477, 2013 WL 5594717, at *4 (N.D. Cal. Oct. 10, 2013)). In any event, *Coffee* also involved game apps that interacted with, and provided information to, the user. *Id.* at *1-2.

By contrast, as alleged, the delete tunes at issue in this case do not involve comprehension or evaluation by their users. The delete tunes use computerized commands to disable emissions controls. They are functional apparatuses that mechanically accomplish the task of deleting those controls—the computerized

9

equivalent of unscrewing and removing emissions-control equipment. (Gov't Br. 27-28 & n.10). They are therefore akin to the computer programs at issue in *Corley* and *Vartuli*, whose functional elements did not enjoy First Amendment protection. For the same reason, delete tunes are not the type of "information" the CDA protects.

EZ Lynk's *amici curae* contend that *Green v. America Online (AOL)*, 318 F.3d 465, 471 (3d Cir. 2003), "rejected the very same argument the government makes here." (Amici Br. 12-13). *Green*, addressing an argument advanced by a *pro se* litigant, concluded that software "created by a hacker" to send an "unseen signal" that "disrupt[s] another computer" constituted "information" under the CDA because "the dictionary includes 'signal' as a definition of 'information.'" 318 F.3d at 469, 471. In its one-paragraph discussion of the issue, *Green* did not consider the "speech-protective purpose" of the CDA, the significant overlap between the concerns addressed by the CDA and the First Amendment, or the difference between functional and expressive elements that software may have depending on how it is presented and used. And to the extent *Green* held that any "signal" is protected "information," it reaches far more broadly than the text of section 230, read naturally, would suggest.[2] The

---

[2] For instance, if an internet service provider negligently fails to secure its network, malicious actors may be able to use that network to harm others' computers through a "distributed denial of service" attack, which involves flooding a network or computer with

10

analysis in the *Green* decision should therefore not be adopted in this case.

EZ Lynk separately argues that interpreting "information" to mean "information capable of comprehension and assessment by a human being" would render the word "speaker" in section 230 "superfluous." (Def. Br. 37-38). That is incorrect. As the government's opening brief explained, at common law, both the speaker and publisher of a defamatory statement could be held liable. (Gov't Br. 6-7, 29). In this context, to "publish" information means to make it public, or to reproduce it for public consumption.[3] By specifying that the provider of an interactive computer service cannot be "treated as the publisher or speaker" of third-party information, the CDA ensures that the service provider cannot be sued under a theory that unlawful speech is its own, or that it republishes it. *See Cianci v. New Times Publishing Co.*, 639 F.2d 54, 60-

_____

excessive traffic. If every "signal" is protected "information," the negligent service provider may rely on the CDA to avoid liability, a result that does not naturally flow from the statute's text.

[3]  Black's Law Dictionary (7th ed. 1999) ("1. To distribute copies (of a work) to the public. 2. To communicate (defamatory words) to someone other than the person defamed."). The provision at issue was enacted in 1996, and its words are given the ordinary meaning they had at that time. *See Food Marketing Institute v. Argus Leader Media*, 588 U.S. 427, 433-34 (2019).

11

61 (2d Cir. 1980) (Friendly, J.) ("a defendant . . . is as liable" for "republish[ing] defamatory statements made by others" "as if he had made the statements himself"; citing Restatement (Second) of Torts § 578). Legislative history confirms that Congress intended to address this issue with its choice of the phrase "publisher or speaker": as also explained in the government's opening brief, a "specific purpose[ ]" of section 230 was "to overrule Stratton-Oakmont v. Prodigy," H.R. Conf. Rep. 104-458, at 194 (1996), a case that relied on the rule that "one who repeats or otherwise republishes a libel is subject to liability as if he had originally published it," *Stratton Oakmont, Inc. v. Prodigy Services Co.*, No. 31063/94, 1995 WL 323710, at *3 (N.Y. Sup. Ct. May 24, 1995). *See Force*, 934 F.3d at 63-64. By prohibiting a provider of an interactive computer service from being treated as a "publisher or speaker," Congress prevented plaintiffs from holding that provider liable by characterizing objectionable speech as the provider's own, or as someone else's speech the provider repeated. Nothing about the meaning of the word "information" makes that phrase superfluous.

## C. The Complaint Does Not Treat EZ Lynk as a Publisher

Separately, EZ Lynk cannot establish that the government's claim treats EZ Lynk as a publisher of information, as the section 230 defense requires. The complaint seeks to hold EZ Lynk liable for its own actions—conduct separate from any publishing of third-party content. (Gov't Br. 28-35). EZ Lynk's response is to attempt to narrow the focus to the cloud service that

12

is part of the system. But EZ Lynk cannot escape its own role in manufacturing and selling a three-component system that disables vehicles' emissions controls, even setting aside its alleged role in collaborating with delete-tune creators, encouraging drivers to install delete tunes, assisting drivers in that installation. *See infra* Part I.d.

"At its core, § 230 bars lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content." *FTC v. LeadClick Media, LLC*, 838 F.3d 158, 174 (2d Cir. 2016) (quotation marks omitted). But this is not such a lawsuit. EZ Lynk does not contest the government's allegations that EZ Lynk manufactures and sells the EZ Lynk System with technical design features that allow it not just to download delete tunes, but to "access[ ] deeper into the vehicle's computers" to install those delete tunes and reprogram a vehicle's computerized emissions controls. (JA 25-26 ¶¶ 47-49, JA 29 ¶ 55, *see also* JA 27-28 ¶ 54 (showing multi-step installation process)). In insisting that no matter what other functions the EZ Lynk System's multiple components perform, the only relevant function is hosting delete tunes on the EZ Lynk Cloud, EZ Lynk simply disregards the allegations in the complaint. (Def. Br. 40-47 (contending that "[t]ransmitting (and even arranging) information," or "mere[ly] hosting" information, is immunized by section 230; and only "acts by independent third parties" are at issue (quotation marks omitted))). As explained in the government's opening brief, this case is not about hosting or screening content; it is about manufacturing and selling a complete system

13

whose parts work together to disable vehicles' emissions controls in violation of the Clean Air Act. (Gov't Br. 28-35). The fact that third-party content is involved does not defeat that claim. (Gov't Br. 31-34).

*In re Apple Inc. App Store Simulated Casino-Style Games Litigation*, 625 F. Supp. 3d 971 (N.D. Cal. 2022), a case cited by EZ Lynk, makes this very point. In that case, plaintiffs sued Apple, Google, and Facebook in connection with third-party applications that permitted illegal gambling. *Id.* at 993-94. While the court held that the defendants were immune under the CDA for claims based on their promotion of the applications, which it deemed to be "editorial" in nature, the defendants' "sale" of virtual gambling chips that could only be used on third-party applications was not publisher conduct and therefore not protected under the CDA. *Id.* ("Plaintiffs therefore do not attempt to treat the Platforms as 'the publisher or speaker' of third-party content, but rather seek to hold the Platforms responsible for their own illegal conduct—the sale of gambling chips."). The same is true here: the conduct at issue is not EZ Lynk's hosting of delete tunes on the EZ Lynk Cloud; it is the sale and manufacture of the EZ Lynk System as a whole, which is an unlawful defeat device.

EZ Lynk maintains that the EZ Lynk System's "inclusion of a physical device with the EZ Lynk Cloud does not remove it from Section 230's scope," pointing out that companies like Apple, Facebook, Amazon, and Google are interactive computer services that publish information and "make" physical devices. (Def. Br. 36, 45). But the situations are not comparable. EZ Lynk

14

does not point to any illegal conduct caused by those companies' connection between the hardware made by those companies and any objectionable information. Here, by contrast, the EZ Lynk System is sold in three linked components—a physical hardware device that uses a smartphone app to connect to a cloud platform to download and install the delete tunes that are at issue in this case. The function of that system, taken as a whole, is not effectively different from a hardware component—such as a special exhaust pipe, or a replacement computer chip (Gov't Br. 27-28 & n.10)—that removes emissions controls in violation of federal law.

### D. EZ Lynk Participated in the Development and Use of Delete Tunes

EZ Lynk has also failed to show that the government's complaint does not adequately allege that EZ Lynk participated in the development and use of delete tunes created specifically for use with the EZ Lynk System to defeat emissions controls. *See LeadClick*, 838 F.3d at 174, 176 (a defendant is "not entitled to immunity" if it has "participated in the development of the [unlawful] content," "assisted in the development of what made the content unlawful," or "materially contribut[ed] to the content's alleged unlawfulness" (quotation marks and alteration omitted)). In fact, the complaint alleges EZ Lynk collaborated with delete-tune creators to ensure that delete tunes were developed for the EZ Lynk System; provided technical assistance to customers attempting to install delete tunes using the EZ Lynk System; and encouraged its customers' installation of delete tunes using the EZ Lynk

15

System. The complaint therefore plausibly alleges that the delete tunes are not "provided by another information content provider." 47 U.S.C. § 230(c)(1).

EZ Lynk first attempts to contradict these allegations, even though, on a motion to dismiss, this Court "must accept as true all nonconclusory factual allegations in the complaint and draw all reasonable inferences in the Plaintiffs' favor." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021). Nevertheless, EZ Lynk claims that the EZ Lynk System's "Terms of Use" (which provide that users may not "[p]romote any illegal activity" on the EZ Lynk Cloud) "alone defeats the government's argument" that EZ Lynk participated in the development and use of delete tunes. (Def. Br. 48-49). Of course, merely stating a policy against illegal conduct does not mean that a company is insulated from any allegation of such conduct (or that the company will not engage in such conduct).

EZ Lynk next tries to contradict the government's allegations by citing an extraneous regulation about the availability of vehicle software applications and calibrations for post-sale vehicle reprogramming. (Def. Br. 49 (citing 40 C.F.R. § 86.1808-01(f)(2)(ii)(G), (f)(17)(iv))). EZ Lynk claims, without support, that its device is the type of "pass-through reprogramming" equipment described in the regulation. (Def. Br. 49). But that is a factual issue. The cited regulation concerns equipment capable of installing calibration software provided by original vehicle manufacturers, who are subject to oversight through the Clean Air Act's certification requirements. *See* 40 C.F.R. § 86.1808-

16

01(f)(12). Of course, the complaint alleges that the EZ Lynk System installs delete-tune software to defeat vehicle manufacturer's emissions controls, not calibration software provided by those vehicle manufacturers. Indeed, EZ Lynk fails to explain how these regulations relate to the development and use of emissions-control defeating software, which is not addressed anywhere in the regulation. The fact that EPA regulations provide for the availability of lawful reprogramming tools to repair and service vehicles does not mean that an unlawful, emissions-control defeating version of such a device could not be manufactured and sold, as the government alleges EZ Lynk has done.

Separately, EZ Lynk challenges the government's allegations of participation in the development and use of the EZ Lynk System. (Def. Br. 50). The government alleges EZ Lynk "collaborate[ed] with [delete-tune creators] to ensure that delete tunes capable of effectively disabling emissions controls [were] readily available to drivers using the EZ Lynk System" by "preview[ing] the EZ Lynk System" during the development of the EZ Lynk System, before it became publicly available. (JA 29 ¶¶ 57, 58). EZ Lynk insists that "[p]reviewing does not imply development of illegal content." (Def. Br. 50). EZ Lynk is wrong. As alleged, EZ Lynk worked with delete-tune creator PPEI "in the early stages of testing the EZ Lynk System approximately two years before the system's launch in 2016," and again previewed the updated device before its launch in 2018. (JA 29 ¶ 58). Similarly, the complaint alleges EZ Lynk "worked with" delete-tune creator GDP Tuning before the EZ Lynk System was publicly available. The clear and reasonable inference is that

17

EZ Lynk worked with delete-tune creators—before its product went on the market and before any EZ Lynk-specific delete tunes were created—to help them develop delete-tunes that would work with the EZ Lynk System. *See Kaplan*, 999 F.3d at 854. Indeed, there is no other plausible reason EZ Lynk would grant delete-tunes creators such special access. The government should be allowed discovery on the relationship between EZ Lynk and these delete-tune creators and EZ Lynk's role in developing delete tunes for the EZ Lynk System.

EZ Lynk also argues that the complaint does not allege EZ Lynk representatives helped drivers defeat emissions controls. (Def. Br. 50). But the complaint specifies three instances where EZ Lynk's technical support representatives assisted a customer installing delete tunes using the EZ Lynk System, including by posting "questions and advice to troubleshoot the issue with the delete process" and providing "long and detailed responses about how to fix" the customer's specific problem installing the delete tune. (JA 32 ¶ 67; Gov't Br. 38-39). EZ Lynk does not address any of these examples. Instead, it attacks the complaint for only alleging support from "unidentified" or "unnamed" EZ Lynk representatives. (Def. Br. 27). But the pleading standard does not require that level of "'detailed factual allegations.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The roles those persons played can be ascertained in discovery. Relatedly, EZ Lynk suggests that the government's allegations are insufficient unless the company's principals themselves have offered this support (Def. Br. 27),

18

ignoring the longstanding commonsense rule that a corporation is responsible for the actions of its employees, even "low-level" ones.[4] *See* Restatement (Second) of Agency § 275 (1958).

Finally, EZ Lynk attempts to characterize the government's allegations of participation in the development and use of delete tunes as merely about EZ Lynk representatives "liking" or "loving" posts on EZ Lynk's Facebook forum. (Def. Br. 50-51). But those reactions demonstrate EZ Lynk's knowledge and approval of the contents of the posts, which described the use of the EZ Lynk System to defeat emissions controls. And the government's allegations are about much more than that: EZ Lynk's actions taken together—giving delete-tunes creators early access to the EZ Lynk System to help them develop their software; assisting customers to install delete tunes; and expressly approving customers' use of the EZ Lynk System to install delete tunes on their vehicles—demonstrate that EZ Lynk was not merely a "neutral conduit" for delete tunes,

---

[4] The allegations in this case differ sharply from those in *United States v. eBay Inc.*, where the district court concluded the "provision of neutral, automatic email prompts and messages, and of payment processing software does not materially contribute to the illegal products' 'alleged unlawfulness'." No. 23 Civ. 7173, 2024 WL 4350523, at *10 (E.D.N.Y. Sept. 30, 2024), *appeal pending*, No. 24-3104 (2d Cir.). In any event, the United States disagrees with the district court's decision in that case.

19

but an active participant and material contributor to their availability and use on the EZ Lynk System.

## POINT II

### The Complaint Adequately Alleges That EZ Lynk Is Liable Under the Clean Air Act

#### A. The EZ Lynk System Is a "Part or Component Intended for Use with" Vehicles

The Clean Air Act prohibits "any person" from manufacturing, selling, offering to sell, or installing "any part or component intended for use with, or as part of," any vehicle or vehicle engine, "where a principal effect of the part or component is to bypass, defeat, or render inoperative" emissions controls, and "where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use." 42 U.S.C. § 7522(a)(3)(B). The district court correctly held that all of these elements have been pleaded in the government's complaint. (JA 116).[5] EZ Lynk's arguments to

_____

[5] EZ Lynk attempts to minimize the district court's conclusion, describing it as "*dicta*" or a mere "suggest[ion]" of liability. (Def. Br. 54, 59). But as the quoted language shows, the court did more than that. And deciding first whether a claim is stated before determining whether an affirmative defense applies is a logical way to proceed, and does not reduce the first decision to *dicta*. Regardless of how it is characterized, the district court's reasoning stands on its own, and should be upheld if this Court determines that the

20

the contrary misconstrue the statutory text, ignore the government's detailed allegations, and raise factual disputes that should be resolved after discovery. (Def. Br. 55-56).

In particular, the government alleges that the EZ Lynk System has a physical component that "plugs into a vehicle's" computer systems to "override or re-program [a] vehicle's computer system" by "install[ing] calibration software" directly onto the vehicle's computer system. (JA 13-14 ¶¶ 47-49). Accordingly, the EZ Lynk Auto Agent is a "part or component." A "part" can be defined as a "component that can be separated from or attached to a system; a detachable piece." American Heritage Dictionary of the English Language (3d ed. 1992).[6] In addition, the EZ Lynk System satisfies the statutory element that it be intended "for use with" or a "part of" the vehicle or its engine. Indeed, the Auto Agent has no function other than as a device "intended for use with" vehicles. (JA 13 ¶ 1, JA 13-14 ¶¶ 46-55,

---

district court's CDA rationale for dismissal was erroneous.

[6] The provision at issue was enacted in 1990; because it does not define either "component" or "part," those words are given the ordinary meaning they had at the time the statute was enacted. *See Argus Leader*, 588 U.S. at 433-34. The same dictionary defines "component" as a "constituent element, as of a system," or a "part of a mechanical or electrical complex"—flexible definitions that also support the government's allegations here.

21

JA 30-32 ¶¶ 61-63). And while it is plugged in, it is functionally "part of" the vehicle, just as any other removable component would be. Under either of those disjunctive elements, then, the EZ Lynk System is covered by § 7522(a)(3)(B).

EZ Lynk insists that the government has not alleged its System is a "part or component" because the statute only applies to "portions of the motor vehicle or engine." (Def. Br. 55). Its narrow focus on a single dictionary definition disregards the statutory language as a whole. In context, as the district court concluded, "part is a capacious term." (JA 117). A part need not mean only a "'subdivision[]'" of something else, as EZ Lynk contends (Def. Br. 55)—as shown by the definition quoted above, it can also be something that attaches to, or plugs into, a system. That Congress intended the definition to be broad is evidenced by the remainder of the statutory language: to be unlawful, a "part or component" must be "intended" either "for use with" or "as part of" a vehicle or its engine. Thus, a "part or component" need not be "part of" the vehicle or engine, as long as it is intended for "use with" the vehicle. That precisely describes the EZ Lynk System: a physical part that attaches to a vehicle's onboard diagnostic port to install software in the vehicle.

EZ Lynk argues that if the EZ Lynk System can be a "part," then other items ranging from phones to cables become "parts" "simply because they could be plugged into a car." (Def. Br. 57). But phones, tablets, and laptops are readily distinguishable from the EZ Lynk System because they are not designed solely (or even primarily) "for use with" a car. In any event, as

22

long as an item plugged into a car does not have "a principal effect" of defeating emissions controls, and its manufacturer or seller does not actually or constructively know it to be used for that purpose, the Clean Air Act's prohibition is not implicated.

EZ Lynk's argument that the EZ Lynk System is a "tool" (Def. Br. 57) is equally off base—a "part or component" can still be a "tool." And its insistence that it is a "neutral tool that has no effect on emissions" is nothing more than a denial of the allegations in the complaint, which is not a proper basis for a motion to dismiss. Nor does it matter that EPA regulations provide for the development of equipment with "'pass-through reprogramming capabilities'" (Def. Br. 58 (quoting 40 C.F.R. § 86.1808-01(f)(17)(iv)))—the mere fact that lawful tools are provided for by regulation is irrelevant to whether similar tools will be manufactured, sold, and intended for unlawful purposes.[7] Holding that a device like the EZ Lynk System is a "part or component" does not "pose an insurmountable"—or any—"hurdle to creation" of reprogramming tools (Def. Br. 59 n.14); all the developer of such a tool need do to avoid § 7522(a)(3)(B)'s prohibition is not give its tools the effect of defeating emissions controls. Exhaust pipes are "parts" intended to be used with cars, and they are widely available on the market, even though some exhaust pipes have been found to be

---

[7]    EZ Lynk criticizes the district court for "giv[ing] no consideration to the word 'tool' as used in" 42 U.S.C. § 7521(m). (Def. Br. 57). The word "tool" is not used in § 7521.

23

defeat devices under the Clean Air Act. (*See, e.g.*, Consent Decree at app. A, *United States v. Meyer Distributing, Inc.*, No. 3:25 Civ. 00004 (N.D. Ind. Jan. 6, 2025)). There is no risk of exhaust-pipe manufacturers deciding never to make exhaust pipes again just because one type of exhaust pipe was found to be a "part" for purposes of the Clean Air Act.

### B. "A Principal Effect" of the EZ Lynk System Is to Defeat Emissions Controls

As alleged in the complaint, a "principal effect" of the EZ Lynk System is the defeat of vehicle emissions controls. The patent for the EZ Lynk System demonstrates that it was specifically designed with the capacity to reprogram emissions controls. (JA 24-25 ¶¶ 45-46). And it does defeat emissions controls: the EZ Lynk System stores delete tunes on the EZ Lynk Cloud computing platform; it transfers delete tunes through the EZ Lynk Auto Agent App; and it installs delete tunes on vehicles through the EZ Lynk Auto Agent device. (JA 25-27 ¶¶ 48-52). Retailers regularly offer the EZ Lynk System for sale bundled together with EZ Lynk-specific delete tunes. (JA 30-31 ¶¶ 61-63).

EZ Lynk argues that the EZ Lynk System is a "neutral tool" and that "'it is the so-called delete tunes that are capable of defeating [emissions controls].'" (Def. Br. 60 (quoting JA 109)). But that is contrary to the allegations in the complaint. The EZ Lynk Auto Agent App connects the EZ Lynk Auto Agent to the EZ Lynk Cloud storage to load delete tunes that are designed specifically to work with the EZ Lynk System. (JA 26-

24

27 ¶¶ 49-54). As alleged, "[t]he EZ Lynk System is essential to drivers' acquisition and installation of EZ Lynk delete tunes." (JA 26 ¶ 50).

EZ Lynk goes on to argue that "[i]f intervening acts of other parties using other products are necessary to accomplish an objective, that objective is not the 'principal effect' of the EZ Lynk System." (Def. Br. 61). EZ Lynk cites no authority in support of that position, which is illogical: there is no reason a device cannot have a "principal effect" of defeating emissions controls just because a third party plays a role. And the Clean Air Act explicitly provides that defeating emissions controls need only be "*a* principal effect" not "*the* principal effect"—making clear that the effect need not be the only or even the most important effect, but only one of the device's principal results. In any event, the supposed "neutrality" of the EZ Lynk System and the absence of pre-loaded delete tunes on the EZ Lynk Auto Agent does not alter the "effects" of the EZ Lynk System as it is "use[d] with" vehicles by EZ Lynk customers. The Act's prohibition of defeat devices is deliberately focused on the "effects" of the product, not how the manufacturer may have intended it to be used. Indeed, Congress considered and rejected conditioning liability on how the manufacturer intended the product to be used. *See* Clean Air Act Amendments (Part 1): Hearing before the Subcommittee on Health and the Environment of the Committee on Energy and Commerce House of Representatives, 100 Cong. 518 (1987) (statement by Julian C. Morris, Automotive Parts and Accessories Association, Inc.). Specifically, in passing the amendment to the Clean Air Act, Congress considered and rejected a version of the statute that would

25

limit liability to "when a part is manufactured, sold or offered for sale with the intent that it be used for tampering by the particular consumer purchasing the part." *Id.* at 528. Congress instead concluded that it was the effect of the device, and not the intent, that was to be the focus of liability. The government's allegations satisfy that prong of the statutory prohibition.

## C. EZ Lynk Knew or Should Have Known That the EZ Lynk System Was Used by Customers to Defeat Emissions Controls

The government's complaint alleges EZ Lynk knew or should have known that the EZ Lynk System was being offered for sale or installed in vehicles to defeat emissions controls. EZ Lynk designed and manufactured the EZ Lynk System to defeat emissions controls: it provides delete tunes on the EZ Lynk Cloud, it transfers delete tunes via the EZ Lynk Auto Agent App, and it installs delete tunes using the EZ Lynk Auto Agent device. (JA 25- 28 ¶¶ 47-54). EZ Lynk also collaborates with delete-tune creators to aid in the creation of delete tunes specifically designed for use with the EZ Lynk System. (JA 29-30 ¶¶ 57-60). Moreover, through its Facebook group, EZ Lynk provides technical assistance to drivers using the EZ Lynk System to defeat emissions controls, and explicitly encourages customers' use of the EZ Lynk System to defeat emissions controls. (JA 31-33 ¶¶ 64-70).

On appeal, EZ Lynk does not even address the allegations that EZ Lynk provided advance versions of the EZ Lynk System to delete-tune creators for the purpose of ensuring that EZ Lynk-specific delete tunes

26

would be available to EZ Lynk's customers. Instead, EZ Lynk argues that the complaint's allegations relating to EZ Lynk's direct assistance and encouragement of drivers using the EZ Lynk System to defeat emissions controls are vague or conclusory. (Def. Br. 62-63). That is wrong.

As alleged, EZ Lynk maintains a Facebook group called the "EZ Lynk Forum," which EZ Lynk describes as a resource for drivers seeking "information and support for everything related to the EZ Lynk Auto Agent." (JA 31 ¶ 64). The EZ Lynk Forum provides contact information for "immediate assistance" by the "EZ LYNK Technical Support Team," and sets forth EZ Lynk's hours of operation. (JA 31 ¶ 64). The EZ Lynk Forum is administered by EZ Lynk representatives and has over 12,000 members. (JA 31 ¶ 64). Hundreds of posts on the EZ Lynk Forum refer to the use of the EZ Lynk System to "delete" emissions controls in vehicles across the United States. (JA 31-33 ¶¶ 64-70). EZ Lynk technical support representatives provide technical assistance via the EZ Lynk Forum to customers attempting to defeat emissions controls using the EZ Lynk System. (JA 32 ¶ 67). And EZ Lynk representatives explicitly approve of the use of the EZ Lynk System to delete emissions controls on many of the EZ Lynk Forum posts. (JA 32 ¶ 66).

Allegations that EZ Lynk representatives—including technical support representatives—assist, encourage, and acknowledge EZ Lynk customers' use of the EZ Lynk System to install EZ Lynk delete tunes on the EZ Lynk Forum thus establish EZ Lynk's knowledge that the EZ Lynk System was being "put to such use."

27

That conclusion follows from the principle that "[i]n general, when an agent is employed to perform certain duties for his principal and acquires knowledge material to those duties, the agent's knowledge is imputed to the principal." *Apollo Fuel Oil v. United States*, 195 F.3d 74, 76 (2d Cir. 1999) (citing Restatement (Second) of Agency §§ 9(3), 268, 272, 275 (1958)); *id.* ("Thus, it is elementary that a corporation can be guilty of 'knowing' or 'willful' violations of regulatory statutes through the doctrine of *respondeat superior*." (quotation marks omitted)); *Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171, 179 (2d Cir. 2004) (noting the "usual presumption that the acts and knowledge of an agent acting within the scope of employment are imputed to the principal").

In response, EZ Lynk again complains that the government did not identify its representatives by name. (Def. Br. 63-64). But, once more, it cites no authority to support the theory that that level of detail is required to plead a prima facie case. *See Iqbal*, 556 U.S. at 678 ("detailed factual allegations" not required in complaint). Nor is it true that employees must be "high-ranking" for their knowledge to be imputed to a corporation—as noted above, the corporation is charged with its employees' knowledge, at least where the employee is acting within the scope of employment or that knowledge is material to the employees' duties. *Apollo Fuel*, 195 F.3d at 76; *Bank of China*, 359 F.3d at 179. And while EZ Lynk cites a single Fifth Circuit case (Def. Br. 64) to suggest that the knowledge of any "mere employee" cannot be attributed to it, the court there in fact recognized that "[w]hether an individual's knowledge will be imputed to the corporation depends

28

on a factual determination, according to the particular circumstances, of the individual's position in the corporate hierarchy, which includes asking if the employee has sufficient responsibility or authority to impute his knowledge to the corporation." *United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 848 F.3d 366, 374 (5th Cir. 2017) (quotation marks omitted); *id.* at 374-75 ("Answering which agent's knowledge is the corporation's knowledge is the linchpin. This analysis will usually involve developing the evidence, both factual and expert, regarding the employees' job titles, their actual responsibilities, and their overall place within the company." (quotation marks omitted)). Indeed, the decision EZ Lynk cites was post-trial—in an earlier decision examining the sufficiency of the allegations in the same case, the Fifth Circuit held that allegations that employees acted within the scope of their employment or were of managerial ranks were not required to survive a motion to dismiss. *United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 727 F.3d 343, 350, 353 & n.14 (5th Cir. 2013).

29

## CONCLUSION

**The judgment of the district court should be reversed.**

Dated:     New York, New York
           January 17, 2025

Respectfully submitted,

EDWARD Y. KIM,
*Acting United States Attorney for the*
*Southern District of New York,*
*Attorney for Plaintiff-Appellant.*

MÓNICA P. FOLCH,
JENNIFER JUDE,
ZACHARY BANNON,
BENJAMIN H. TORRANCE,
   *Assistant United States Attorneys,*
           *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 6987 words in this brief.

EDWARD Y. KIM,
*Acting United States Attorney for the*
*Southern District of New York*

By: MÓNICA P. FOLCH,
*Assistant United States Attorney*